# **<u>Exhibit 1</u>**

LEXSEE 1997 DEL. SUPER. LEXIS 264

**HARRY JOSEPH and BRENDA JOSEPH, individually and as husband and wife, Plaintiffs, v. JAMESWAY CORPORATION, a Delaware corporation, and ROADMASTER CORPORATION, a Delaware corporation, Defendants.**

**CIVIL ACTION NUMBER 93C-12-182-JOH**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1997 Del. Super. LEXIS 264*

**June 16, 1997, Submitted; June 19, 1997, Argued**
**July 9, 1997, Decided**

**SUBSEQUENT HISTORY:**

Released for Publication by the Court August 29, 1997.

**DISPOSITION:** [*1]

Motion of Defendant Roadmaster Corporation for Summary Judgment GRANTED.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Elwood T. Eveland, Jr., Esq., of Woloshin, Tenenbaum & Natalie, P.A., attorney for plaintiffs.

Francis J. Jones, Jr., Esq., and Eileen K. Andersen, Esq., of Morris, James, Hitchens & Williams, attorneys for defendant Roadmaster Corporation.

**JUDGES:** Jerome O. Herlihy, Judge

**OPINIONBY:** Jerome O. Herlihy

**OPINION:**

*MEMORANDUM OPINION*

Upon Motion of Defendant Roadmaster Corporation for Summary Judgment

HERLIHY, Judge

Defendant Roadmaster Corporation has moved for summary judgment in this personal injury action. Plaintiff Harry Joseph claims he was riding a stationary bicycle, manufactured by Roadmaster, when it broke and he fell.

The bicycle was returned to the store from which it had been purchased. It has now disappeared. Joseph's expert, thus, has been unable to examine it. Joseph has brought an action for negligence and breach of warranty.

The expert has offered testimony about possible design and/or manufacturing defects in the bicycle.

Roadmaster contends those opinions establish neither negligence nor proximate cause. It also argues that since the bicycle has been lost and is unavailable for examination, [*2] plaintiffs cannot maintain their claims. The issues are whether Joseph has shown there is a genuine issue of material fact on the issues of negligence or breach of warranty and the impact on the lost bicycle to Joseph's claims.

*FACTS*

Joseph injured his knee in an industrial accident in June 1991, ultimately resulting in knee cap replacement surgery. In 1992, as part of Joseph's continuing rehabilitation, Joseph's physician prescribed that Joseph ride an exercise bicycle for fifteen minutes, twice a day. With the approval of the worker's compensation adjuster, a stationary bicycle was purchased from Jamesway Corporation n1 and, on April 15, 1992, delivered to Joseph. With his family's help, Joseph assembled the bicycle.

n1 Jamesway was one of the two original defendants. It is no longer in the case.

On June 22, 1992, Joseph was riding the stationary bicycle when he heard a crack and then fell backwards onto a basket full of clean towels. He alleges that he injured himself in the fall.

Joseph's wife returned [*3] the bicycle to Jamesway and exchanged it for a new one. The broken bicycle was discarded before it could be inspected. It has never been recovered.

Joseph's expert, Dr. Lacek, has now been deposed. Because of the importance and length of his deposition testimony to the issues raised in the current motion, the Court will cite and discuss it in greater detail later in this

1997 Del. Super. LEXIS 264, *

decision.

## STANDARD OF REVIEW

Summary judgment is proper when there are no genuine issues of material fact and the defendant is entitled to judgment as a matter of law. n2 The Court must view the evidence in a light most favorable to the non-moving party. n3 If there is no material factual issue, the defendant is entitled to summary judgment. n4

> n2 *Merrill v. Crothall-American, Inc., Del.Supr., 606 A.2d 96, 99-100 (1992).*

> n3 *Billops v. Magness Const. Co., Del.Supr., 391 A.2d 196, 197 (1978).*

> n4 *Pierce v. International Ins. Co. of Ill., Del.Supr., 671 A.2d 1361, 1363 (1996).*

## DISCUSSION

### Manufacturing Defect [*4]

During oral argument and throughout this litigation, Joseph maintains that his claim involves both a design defect and a manufacturing defect. The substance of Joseph's expert's views, however, is that there was more likely a manufacturing defect than a design defect. In large part, he bases that view on the testimony of two of Roadmaster's employees. Their deposition testimony was that there had been no breakage of the seat pole, such as allegedly occurred here, on similar model bicycles.

The Court's analysis, therefore, will first focus on the claim of a manufacturing defect. Roadmaster argues Joseph's claim is barred outright because of the disposal of the bicycle in question. It also contends that the record shows there is insufficient evidence of a manufacturing defect.

### Loss of Bicycle

Roadmaster argues in favor of a *per se* rule that loss of the bicycle results in dismissal of Joseph's claim. There is some authority in manufacturing defect cases to support this argument but the Court's analysis of case law in this area suggests a *per se* rule is too harsh.

In *Troy v. Kampgrounds of America, Inc.* n5, there was an explosion of a propane gas tank that was connected [*5] to several washing machines. Several official investigators examined the various remains right after the explosion, along with an investigator from the gas supplier. Several days after the explosion, the remains of the various equipment were destroyed. No plaintiff or defendant expert

examined any part of the appliances.

> n5 *Pa.Super., 581 A.2d 665 (1990).*

That inability was a factor in the trial court's award of summary judgment in favor of the defendants. However, employing a "malfunction" theory of products liability, that court held the trial court's award of summary judgment was in error. Such a theory allows a *prima facie* case to be made where there is (1) a malfunction and (2) evidence eliminating abnormal use or reasonable secondary causes for the malfunction. n6 This appears to be a circumstantial means of showing defect.

> n6 *Troy, 581 A.2d at 668.*

[*6]

*Troy* is of limited value in the sense that the trial court appeared to have ignored that plaintiffs' expert opinion about the explosion's cause. Inferentially, however, the value is the plaintiffs were allowed to proceed even though no expert for any *party* saw the devices at issue.

In a case involving a shattered coffee pot, the broken glass portions were lost by the plaintiffs or their counsel. n7 This loss prevented General Electric from preparing a defense and possibly suing one of the six or so suppliers of the glass component of the pot. The court quoted language from the unreported case of *Martin and Greenspan v. Volkswagon of America* n8:

> n7 *Roselli v. General Electric Co., Pa.Super., 410 Pa. Super. 223, 599 A.2d 685 (1991).*

> n8 *E.D.Pa., No. 88-8261, 1989 WL 81296* (July 13, 1989).

The defendant has been deprived of the opportunity to have an expert examine the car and to testify if appropriate, that a defect did not cause the Audi to malfunction. Therefore, the plaintiffs [*7] should not be permitted to proceed without producing the vehicle.

* * *

To permit claims of defective products where a purchaser of the product has simply thrown it away after an accident, would both encourage false claims and make legitimate defense of valid claims more difficult. It would put a plaintiff (or a plaintiff's attorney) in the position of deciding whether the availability of the item would help or hurt his or her case. Where producing the product for defense inspection would weaken rather than strengthen a case, we unfortunately are obliged to conclude that some plaintiffs and attorneys would be unable to resist the temptation to have the product disappear. n9

n9 *Roselli*, 599 A.2d at 687-88.

The court went on to discuss the malfunction theory of recovery but in the context of recovery under strict liability. n10 Delaware does not recognize or allow recovery for strict liability in sales. n11

n10 *Id.* at 688.

[*8]

n11 *Cline v. Prowler Industries of Maryland, Inc.*, Del.Supr., 418 A.2d 968 (1980).

In another case, where a sample of an "exploding" drain cleaner could not be provided, the court said summary judgment, under *Roselli,* would be awarded to the cleaner manufacturer. n12

n12 *Lee v. Boyle-Midway Household Products, Inc.,* W.D.Pa., 792 F. Supp. 1001, 1006 (1992); accord *Bardaji v. Flexible Flyer Co.,* E.D.Pa., C.A.No. 95-CV-0521, McGlynn, J. (September 25, 1995) (1995) WL 568483) (sled broke but was returned to resort renting agency and was not produced).

In *DiIenno v. Libbey Glass Div., Owens-Illinois, Inc.* n13, the plaintiff bought a glass jar containing candy and

peanuts. It was used for several days. While attempting to refasten its cork lid, the jar shattered and the plaintiff cut her wrist. Co-workers threw out the glass pieces.

n13 *D.Del.,* 668 F. Supp. 373 (1987).

[*9]

Experts for both parties examined similar jars and found no defects. The court noted that such absence did not mean there were no manufacturing defects. It noted, however, that the plaintiff had the burden of proving a defect. It did not dismiss the plaintiff's action based alone on the absence of the glass jar pieces. n14

n14 *DiIenno.* at 378.

In this case, there is no suggestion that the return of the bicycle to Jamesway was for an evil or other improper motive. A replacement bicycle was obtained. Nor does it appear, based on the record to date, that Joseph's injuries immediately manifested themselves to any great degree alerting him to the need to take protective measures about the bicycle.

For these reasons, the Court is reluctant to adopt a bright line rule that loss of evidence in a products liability case compels dismissal. The Court concurs that there are occasions where a plaintiff may be able to circumstantially prove a negligence case involving a manufacturing defect even where the product [*10] is lost or destroyed. Of course, the burden is not light; the plaintiff must establish that negligence is the only possible inference from the circumstantial evidence. n15

n15 *Ciociola v. Coca-Cola Bottling Co., Del.Supr.,* 53 Del. 477, 172 A.2d 252, 257 (1961).

Evidence of Manufacturing Defect

Negligence is never presumed. It must be proven. n16 Ordinarily, questions of negligence are not decided on motions for summary judgment but are left for the trier of fact. n17 Where undisputed facts compel only one conclusion, however, the Court has the duty to enter a judgment accordingly. n18

n16 *Wilson v. Derrickson,* Del.Supr., 54 Del. 199, 175 A.2d 400, 401-02 (1961).

n17 *Roper v. Stafford, Del.Super., 444 A.2d 289, 291 (1982).*

n18 *Faircloth v. Rash, Del.Supr., 317 A.2d 871, 871 (1974).*

In order to prove [*11] a claim of negligence in the context of a products liability action alleging a manufacturing defect, the plaintiff must establish that the product was defective. n19 Where a plaintiff is attempting to prove negligence circumstantially, he must establish that negligence is the only possible inference. n20 If the defendant can demonstrate the complete failure of proof concerning an essential element of the plaintiff's case, such as the existence of a defect, summary judgment is warranted. n21

n19 *Farm Family Mutual Ins. Co. v. Perdue, Inc.,* Del.Supr., No. 416, 1990, Walsh, J.

n20 *Ciociola, 172 A.2d at 257.*

n21 *Garneski v. Martin,* Del.Super., C.A.No. 86C-OC-196, Del Pesco, J. (March 1, 1990) (*citing Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1987).*

Joseph must present some evidence of a manufacturing defect at the time of delivery to Jamesway. n22 Joseph's expert testified in his deposition as follows:

n22 *Kates v. Pepsi Cola Bottling Co. of Salisbury, Md., Del.Super., 263 A.2d 308, 311 (1970).*

[*12]

Q. Now, I think you told me earlier you think there was a defect in the manufacturing of the product?

A. Yes. I believe I answered why on the basis for that.

Q. Because if failed under normal, expected conditions?

A. That was part of the answer, yes. The second part was the deposition testimony, where neither of the two gentlemen from Roadmaster testified, that they were aware of a rash of these kinds of failures. And my earlier response to that line of questioning was, that leads me to believe

we are dealing more with a rogue.

* * *

Q. I started by asking you: Do you know what was the manufacturing defect? Why the bicycle failed? And I think you said, No, you didn't, because you did not have enough information. Is that accurate?

A. Yes.

* * *

Q. . . . You can't specify for me the fractures or the deformities on the bicycle after the incident, other than in an area near [the seat post] all you know is that it was deformed in some way?

A. No. All I know is it broke.

Q. You don't know how it broke.

A. Since I don't have the pieces, no. All I know, I have, essentially, a new unit that was under maximum load being used within the prescribed time frame and [*13] frequency of the manuals, and it failed.

Q. But you can't describe for me the specific deformities or fractures; is that fair?

A. That's correct. I can describe for you various ones. Are they applicable in this one? I can't say.

* * *

Q. The second part of your conclusion, the bicycle was defective is a manufacturing defect; correct?

A. When this report was prepared, yes. If I had strictly this report to go on, without noting else, absolutely a manufacturing defect.

Q. But you can't tell me what the specific manufacturing defect is, other than it failed?

A. In this particular case, yes. Seat post was too weak. It failed. But I can't tell you why it failed. I can tell you it should not have failed.

* * *

Q. In other words, you can't tell me

specifically what caused it. Just that it happened?

A. Based on your line of questioning, yes.

Q. And what is in the report?

A. Yes.

Q. Well, your answer troubles me, I thought I asked the question enough times.

A. To say that I don't know specifically the mode of failure?

Q. Right.

A. That's correct.

* * *

Q. Were any tests ever done on [an exercise bicycle] or any other similar model?

A. Not on that exhibit; [*14] nor of any additional parts. What I was going to do is buy a bunch of seat posts.

Q. That has not been done?

A. No.

Q. Is that being contemplated?

A. It was contemplated.

Q. Why was it rejected?

A. Because the fracture or the exact parts that failed weren't available. I couldn't determine the mode of failure. Then I, therefore, can't determine the mode of loading under which it failed. Therefore, any testing I do, would be, essentially, erroneous. All I would be able to do is to be able to perform a different series of tests under load conditions, under different directions, and set up what I will call a matrix. That's all as far as I could ever go with it.

Q. Did you get that far?

A. No. No testing was done. n23

n23 Lacek deposition at 59-60, 62-63, 67-68, 73-74, 102-103, 29-30.

This testimony and Joseph's version of how the bicycle seat pole broke are strikingly similar to the record before the Court in *DiIenno:*

> The sum total of DiIenno's evidence on this issue consists of her deposition [*15] testimony of the circumstances surrounding the accident and an expert report concluding that the jar was defective. At her deposition, DiIenno gave a detailed account of the jar's shattering, but she offered no explanation as to what caused the jar to shatter or how the jar was defective. The report of her expert concludes that the jar must have been defective to shatter the way it did. However, this conclusion was not based on scientific tests or data but solely on DiIenno's account of the accident and the assumption that the jar must have been defective because it shattered. Thus, DiIenno has produced no evidence of a manufacturing defect apart from the occurrence of the accident itself. This is wholly insufficient. n24

n24 *DiIenno*, 373 A.2d at 378.

This Court has said that while the inability to produce and test the broken bicycle is not *per se* fatal to Joseph's claim, his circumstantial evidence case must be that negligence is the only possible inference from the circumstantial evidence. n25 [*16]

n25 *Ciociola*, 172 A.2d at 257.

In short, viewing the evidence in a light most favorable to him, all Joseph has shown is that the bicycle broke but no other Roadmaster bicycles broke. This is no more than conjecture or, at most, a possibility. That is insufficient even to survive a motion for summary judgment. n26

n26 *Phillips v. Delaware Power & Light Co.,*
*Del.Supr., 59 Del. 179, 216 A.2d 281, 284 (1966).*

Therefore, as to a claim of a manufacturing defect, Roadmaster's motion for summary judgment must be

1997 Del. Super. LEXIS 264, *

**GRANTED.**

*Design Defect*

As noted, Joseph has also alleged there was a design defect in the bicycle.

Inability to Produce Bicycle

The inability to produce the product used is less important, if important at all, on a claim of a design defect. Such a defect implicates a product line flaw. Thus, Joseph's inability [*17] to produce the bicycle is less critical to his case. n27

n27 DiIenno, *668 F. Supp. 373; Evans v. FMC Corp.,* Del.Super., C.A.No. 89C-AU-27, Graves, J. (March 9, 1992); *Giordano v. The Firestone Tire & Rubber Co., N.D.Ill., No. 83 C1298, Decker, J. (April 25, 1985) (1985 WL 1000).*

Evidence of Design Defect

In his deposition testimony, Joseph's expert stated:

Q. Your quarrel with the design is that there was no testing using the dynamic or cyclic loading. Is that what you are saying?

A. Dynamic or cyclic loading.

* * *

Q. So your complaint with the design of this product is that there is no evidence to you that it was ever tested with, basically, the pedals moving?

A. Tested under greater than anticipated load conditions and at maximum rated load conditions to failure.

* * *

Q. . . . So, the design defect, in your opinion, is the failure to test?

A. that's were I would hold it. Yes.

Q. Any other design defect with respect to this product . . . or the bicycle involved in [*18] the incident itself?

A. I would have to say, no.

* * *

A. So, we are both clear, and you have a complete answer. Since I don't have the bicycle, I can't say even there was a design

defect in what I will call insufficient or incomplete test program. Did it have a bearing on this accident? That, I don't know.

* * *

Q. . . . I think you told me today, as a result of reading Mr. Craig's and Mr. Wilkerson's depositions and seeing their exhibits, that you now have an opinion with respect to design that we have already gone over?

A. We have gone over, and I have also said, yes. I regard that as a design defect as part of the designs or the testing of the product. I also said, I can't tell you that had any bearing. I suspect it may have, but I can't say.

* * *

Q. One area I want to make sure I'm clear on, because I'm confused. You have told us about an opinion with respect to design defect. Are you prepared to testify at this point that that design defect caused the incident with Mr. Joseph?

A. I would have to say, no, for the reasons I explained earlier. n28

n28 Lacek deposition at 56-57, 59, 72 77 and 104.

[*19]

There are two issues raised in this testimony. One, is there a cause of action for failure to test? Second, and more importantly, does this testimony demonstrate that Joseph cannot satisfy the proximate cause element of his claim?

As to the first issue, there is no separate cause of action for failure to test.

In *Kociemba v. G.D. Searle & Co.* n28, the court refused to permit a claim based solely on the failure to test. The court explained why the failure to test cannot stand as an independent cause of action.

Presumably, the reason that manufactures are under a duty to test their products is to discovery defects or dangers associated

with use of the products. Once the manufacturer has discovered a defect or danger the manufacturer should either change the product's design or manufacturing process, or warn consumers of the danger associated with using the product.

Thus, unless the manufacturer's breach of its duty to test leads the manufacturer to produce a product that is defective in design, manufacture, or warning, no injury can result. If the manufacturer designs the product safely, manufactures the product safely, and provides an adequate warning of dangers inherent [*20] in the use of the product, then a failure to test the product cannot, standing alone, cause any injury. The duty to test is a subpart of the other three duties because a breach of the duty to test cannot by itself cause any injury. n29

n29 *Id.* at 1527.

In *Adams v. G.D. Searle & Co., Inc.,* the plaintiff alleged negligence in the defendant's failure to test the product. The court adopted the reasoning of *Kociemba* and found that "a manufacturer's duty to inspect and test is not a separate cause of action. The duty to test . . . is a subpart of a manufacturer's duty to design a product with reasonable care, and thus is subsumed in the plaintiff's claims for defective design and failure to warn." n30

n30 *Fla.App.,* 576 So. 2d 728, 730-31 (1991).

It is unclear from the expert's testimony that he considers the extent of Roadmaster's [*21] testing to be a failure to safely design the bicycle or a failure to warn potential users. While no discrete claim for failure to test will be recognized, for purposes of this motion, the Court will classify his opinion as coming within either the duty to design safely or the duty to warn.

But, Joseph's claim must fail for a more fundamental

reason. As with negligence, the issue of proximate cause is ordinarily one for the jury. n31 As part of his claim, Joseph must show there is a proximate cause between Roadmaster's negligence and his injuries. n32

n31 *In re: Asbestos Litigation Pusey Trial Group v. Owens-Corning Fiberglas Corp., Del.Supr., 669 A.2d 108, 113 (1995).*

n32 *Culver v. Bennett, Del.Supr., 588 A.2d 1094, 1097 (1991).*

Joseph's expert testified that the design defect he claimed existed did not cause, or he could not say it caused, the injuries sustained. Without that linkage, Joseph's claim fails. For that reason, Roadmaster's motion for summary judgment on the grounds of a design [*22] defect must be **GRANTED.**

*Breach of Warranty*

Joseph also made claims of breach of express warranty, breach of warranty of merchantability and breach of warranty of fitness for a particular purpose. Joseph's claims are based on the claim that the bicycle was defective. n33 Because Joseph cannot demonstrate that the bicycle was defective and/or that there was a defect n34 which caused injury, the claims for breach of warranty must fail. Defendants motion for summary judgment, as to the claims for breach of warranty, is **GRANTED.**

n33 Complaint at P 16.

n34 *Towe v. Justis Brothers, Inc., Del.Super., 290 A.2d 657, 658 (1972)* and *DiIenno, 668 F. Supp. at 377.*

*CONCLUSION*

For the reasons stated herein, the motion of defendant Roadmaster Corporation is **GRANTED.**

**IT IS SO ORDERED.**

# **Exhibit 2**

LEXSEE 2004 U.S. DIST LEXIS 20574

**JEROME C. SMITH and LISA M. SMITH, Plaintiffs, v. HENRY S. BRANSCOME, INC., MITCHELL DISTRIBUTING COMPANY, INC., and INGERSOLL-RAND CO., INC., Defendants.**

**Civil Action No. 03-349-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 20574; CCH Prod. Liab. Rep. P17,172*

**October 8, 2004, Decided**

**DISPOSITION:** Defendants' motions for summary judgment were granted. Motion to exclude testimony was denied as moot.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] William R. Peltz, Esquire, Kimmel, Carter, Roman & Peltz, P.A., Bear, Delaware, Counsel for Plaintiffs, Of Counsel: Robert J. Mongeluzzi, Esquire, Saltz, Mongeluzzi, Barrett & Bendesky, Philadelphia, Pennsylvania.

William J. Cattie, III, Esquire, Rawle & Henderson LLP, Wilmington, Delaware, Counsel for Defendant Mitchell Distributing Company, Inc.

Stephen P. Casarino, Esquire, Casarino, Christman & Shalk, Wilmington, Delaware, Counsel for Defendant Henry S. Branscome, Inc.

**JUDGES:** Kent A. Jordan, District Judge.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

**MEMORANDUM OPINION**

**JORDAN, District Judge**

**I. INTRODUCTION**

This is a civil action removed to this court from the Superior Court for the State of Delaware in and for New Castle County ("Superior Court"). (Docket Item ["D.I."] 66, Ex. I.) Jerome Smith ("Plaintiff") filed suit against Ingersoll Rand Co., Inc. ("Ingersoll"), Henry S. Branscome, Inc. ("Branscome"), and Mitchell Distributing Co., Inc. ("Mitchell") in the Superior Court on January 23, 2003, alleging negligence, breach of the Delaware Uniform Commercial Code ("UCC"), and products liability. (*Id.*)

Lisa Smith filed suit against the same parties for loss [*2] of consortium. (*Id.*) Defendant Ingersoll was dismissed from the case by stipulation of the parties. (D.I. 66 at 1.) Jurisdiction is proper based on diversity of citizenship under *28 U.S.C. § 1332*.

Presently before me are three motions. The first is a Motion for Summary Judgment filed by defendant Branscome. (D.I. 66.) The second is a Motion for Summary Judgment filed by defendant Miller. (D.I. 67.) The third is Miller's Motion to Exclude the Testimony of Douglas Brooks. (D.I. 69.) For the reasons that follow, I will grant the motions for summary judgment and will deny as moot the motion to exclude testimony.

**II. BACKGROUND**

The undisputed facts are as follows. On June 22, 1999, Plaintiff was employed by Richard's Paving as the supervisor of a crew of workers repaving the driveway portions of the parking lot at the Price's Corner Shopping Center. (D.I. 68 at 3; *see* D.I. 66 at 1.) n1 Plaintiff was operating the paver and, behind him, Mr. Antonio Cervantes, a member of the crew, was operating an Ingersoll Rand, Model DA-48, vibratory roller (the "roller"). (D.I. 68 at 3; D.I. 73 at 3.) Mr. Cervantes drove the roller so close that he struck Plaintiff's [*3] leg and pinned it against the rear of the paver. (D.I. 68 at 3.) Mr. Cervantes tried to move the roller backwards, away from the paver, by pulling the propulsion lever toward him. (*Id.*) Instead of going backwards, the roller moved forward and crushed Plaintiff's lower leg, resulting ultimately in its amputation. (*Id.*)

n1 Some citations herein are to the parties' briefing, which in turn has citations to record evidence.

Ordinarily, a roller operates in an intuitive way, with forward pressure on the propulsion lever causing the roller to move forward, and reverse pressure causing the reverse. At some unknown point in time, the cables connected to

the roller's propulsion lever had been switched so that, when the propulsion lever was pushed forward, the roller would move in reverse instead of moving forward and, when the lever was pulled backward, the roller would move forward instead of moving backward. (D.I. 66 at 2-3.) The lever was marked with decals indicating the modified function. (*Id.*) There is [*4] "no record that Branscome [or] Mitchell, ... performed any repairs or modifications to the propulsion lever or its cables while it was in their possession." (*Id.*) The only repair to the roller of which there is evidence indicating a possible affect on the cables was performed by Mitchell on June 18, 1992. (*See* D.I. 68 at 5-6; D.I. 73 at 3.) Whether that repair included the modification that switched the propulsion direction on the roller is disputed. (D.I. 68 at 5; D.I. 73 at 3.) Plaintiff's expert, Mr. Brooks, opined that it was during these repairs that the modification occurred because they are the only records indicating that the cables in the pedestal were removed from the bell crank and the propulsion lever. (D.I. 73 at 4.)

Plaintiff, Mr. Cervantes, and Richard Pendiak, who is the owner of Richard's Paving, were all familiar with the modified propulsion lever on the roller. (D.I. 81, Ex. 1 at 58-61; D.I. 81, Ex. 2 at 107-09; see D.I. 66 at 1.) The roller was used by Richard's Paving for two and a half years before the accident to Plaintiff. (D.I. 81, Ex. 2 at 107.) According to Plaintiff, the modification "never seemed to be a problem." (*Id.* at 109.)

The roller [*5] at issue was manufactured by Ingersoll in 1986, sold to defendant Mitchell in August 1986, resold to Branscome in September 1986, and put up for auction ten years later, where it was purchased by Richard's Paving on October 30, 1996. (D.I. 66 at 1.) Branscome specializes in road construction and asphalt paving. (*Id.*) While Branscome owned the roller at issue, it performed routine maintenance, such as changing the oil and filters. (*Id.*) For major repairs or mechanical work, Branscome sent the roller to Mitchell. (*Id.*)

Mr. Pendiak, personally made the purchase of the roller at auction. (*Id.*) He received and reviewed an auction brochure which described the roller; he knew that he was buying the roller "as is," and, prior to making the purchase, he and his mechanic drove it back and forth. (*Id.*) Nevertheless, Mr. Pendiak was familiar with this type of roller. (*Id.* at 3.) Mr. Pendiak has no recollection that the roller operated differently than any other equipment in his possession. (*Id.* at 2.) He did not notice anything out of the ordinary in the way that the lever moved the roller forward and backward. (*Id.* at 3.)

Mr. Pendiak understood that the roller [*6] came with no warranties. (*Id.*) The brochure stated: "Descriptions and

conditions of equipment in this catalog are merely a guide and are in no way a warranty or guarantee, expressed or implied." (*Id.*) The following disclaimers were part of the sale agreement, as stated on page two of the brochure:

> NO WARRANTIES; all properties being sold AS-IS, WHERE-IS and with all faults. There are no warranties, representations or guarantees, expressed or implied, as to the quality, character, or condition of any of the property. The implied warranty of merchantability is expressly disclaimed. There is no warranty of fitness for a particular purpose.

(*Id.*) Page three of the brochure restated these same disclaimers and that the descriptions and conditions in the catalog of the items for sale were to be used as a guide only, and not as a warranty or guarantee. (*Id.*)

The roller was available for public inspection prior to the auction, and as mentioned, Mr. Pendiak and his mechanic tested it. (*Id.*) The signed registration agreement of Richard's Paving sets forth the same conditions and disclaimers. (*Id.*) Mr. Pendiak purchased the roller for $ 12,500 in 1996 and [*7] used it through March 2001. (*Id.*; D.I. 68 at 4.) According to the Plaintiff, the equipment was used by Richard's Paving with a frequency on the order of seven or eight times within any given six month period. (D.I 81, Ex. 2 at 109.)

## III. STANDARD OF REVIEW

Pursuant to *Federal Rule of Civil Procedure 56(c)*, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)* (2004). In determining whether there is a triable dispute of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).* However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).* To defeat a motion for summary judgment, *Rule 56(c)* requires that the non-moving party [*8] "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*

*475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(c)* (2004). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Inds. Co., Ltd., 475 U.S. at 587* (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

## IV. DISCUSSION

Plaintiff has conceded that his breach of warranty claims against defendants Branscome and Mitchell are barred by the statute of limitations. (D.I. 74 at 5-7; D.I. 73 at 5.) Therefore, the only remaining claim asserted by Plaintiff is for negligence. n2 Inasmuch as jurisdiction in this case is based on diversity of citizenship, I must apply the substantive law of *Delaware*. [*9] *Erie Railroad Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938)*.

> n2 Plaintiff's wife, Lisa Smith, has asserted a claim for loss of consortium. (D.I. 66, Ex. I at 12.) This claim, however, is not the subject of the defendants' motions. Since the claim is strictly derivative of Plaintiff's claim, *See, James Wiers v. Roby Barnes, 925 F. Supp. 1079, 1096 (D. Del. 1996)*, my holding in this case requires that her claim also be dismissed.

Defendant Branscome makes several arguments in support of its Motion for Summary Judgment. First, Branscome argues that Plaintiff has not alleged that Branscome owes Plaintiff a duty of care and that therefore, the allegations of negligence should be dismissed for failure to state a claim. (D.I. 66 at 16-18.) Second, Branscome argues that a seller of an allegedly defective product owes no duty of care to a buyer who purchases an item "as is" or otherwise acknowledges the defect or condition of the goods upon acceptance. (*Id.* at 19-22.) Third, Branscome argues [*10] that Plaintiff's employer, Richard Pendiak, was a "sophisticated purchaser" of an "As Is" vibratory roller, and that "Plaintiff and his co-workers were aware of the alleged alterations ... long before the accident occurred, thereby relieving defendant Branscome of a duty to warn Plaintiff." (D.I. 81 at 6-10.) Fourth, Branscome argues that Plaintiff has failed to offer any "proofs of fact" to support the claim that Branscome

acted negligently or breached a standard of care and, therefore, Plaintiff has failed to establish a *prima facie* case of negligence. (D.I. 66 at 23-27.)

Plaintiff opposes Branscome's Motion for Summary Judgment and makes two arguments in response. First, Plaintiff points to two allegations in his Complaint which, he says, show that he has alleged that Branscome owed him a duty of care: (1) that "defendant Mitchell sold the [roller] to defendant Branscome on September 16, 1986," and (2) that "defendant Branscome owned and operated the roller until it was sold at auction on October 30, 1996 to Richard's Paving, Inc." (D.I. 74 at 8 (quoting D.I. 66, Ex. I, at P 5.)) More specifically, Plaintiff alleges that Branscome owed a duty of care to him under *§ 388 of* [*11] *the Restatement (Second) of Torts* because Branscome "was the supplier of a defective chattel." (*Id.*) Second, Plaintiff argues that Branscome cannot evade liability for supplying a defective product, even if Plaintiff's employer purchased the roller "As Is." (*Id.* at 9.)

Defendant Mitchell argues that Plaintiff has failed to produce any evidence that Mitchell made the changes to the propulsion lever resulting in the reversal of the lever's directional control. (D.I. 68 at 9.) Mitchell argues that the Plaintiffs theory calls for pure speculation that during one of several occasions that Mitchell serviced the roller between 1992 and 1995, it reversed the propulsion direction. (*Id.* at 11.)

In order to recover in an action for negligence, one of the elements a Plaintiff must prove by a preponderance of the evidence is that the defendant's negligent act or omission violated a duty which was owed to the Plaintiff. *Culver v. Bennett, 588 A.2d 1094, 1096-97 (Del. Supr. 1997)*. Delaware has recognized a duty of care that sellers have to warn of known dangers associated with products they place on the market. *Wilhelm v. Globe Solvent Co., 373 A.2d 218, 223 (Del. Super. Ct. 1977)*, [*12] *aff'd in part, rev'd in part, 411 A.2d 611 (Del. Supr. Ct. 1979)*. A seller may have learned of such danger either through actual or constructive knowledge. (*Id.*)

Considering the undisputed facts in the light most favorable to Plaintiff, that Plaintiff has still failed to prove sufficient facts upon which to base a claim against either Branscome or Mitchell for negligence for failure to warn. Plaintiff has not offered sufficient evidence to prove that Mitchell or Branscome made the modification to the propulsion lever. Plaintiff asserts that Mitchell made the modification to the propulsion lever, but does so solely on the basis of its expert's speculation.

Plaintiffs expert, Mr. Brooks, prepared a report in which he based his conclusion on one repair record

Case 1:04-cv-01462-KAJ    Document 39-4    Filed 08/05/2005    Page 13 of 14

Page 4

2004 U.S. Dist. LEXIS 20574, *; CCH Prod. Liab. Rep. P17,172

provided by Mitchell. (D.I. 71 at A-175-85, Preliminary Engineering Report of Douglas Brooks, Jan. 30, 2004.) In his report, Mr. Brooks acknowledges that Mitchell serviced the roller on June 18, 1992 and concluded that it was at this time that the propulsion lever was reversed. (D.I. 71 at A-178.) Mr. Brooks notes that the service record described work performed on the "hoses, cables, and electrical wire" and [*13] the control console. (Id.) From that service record, Mr. Brooks inferred that there was a directional movement problem that had to be repaired. (Id.) Mr. Brooks' last statement, however, is illustrative of the Plaintiff's case: "What was done to repair this issue is unknown." (Id.) One is left with nothing more than an inference (that a directional movement repair was made negligently) upon an inference (that a directional movement repair was made at all) on which to hang the entire liability case, and they are not facially strong inferences either. n3

> n3 While I do not think it necessary to conclude that Mr. Brooks' testimony would have to be excluded under *Daubert v. Merrell Dow Pharms., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, I recognize that my conclusion as to the insufficiency of the evidence can be interpreted as, in effect, granting Mitchell's *Daubert* motion.

Regardless of whether the directional change in the cables can be attributed to Mitchell, however, it is dispositive that both [*14] Plaintiff, who was the site supervisor, and Mr. Cervantes, the operator of the roller on the day of the accident, were fully aware of the modification to the propulsion lever. Both stated in their depositions that they were familiar with the operation of the modified lever. (D.I. 81, Ex. 1 at 58-61; D.I. 81, Ex. 2 at 107-09; *see* D.I. 66 at 1.) The roller had been used by Richard's Paving for two and a half years before the accident. (D.I. 81, Ex. 2 at 107.) According to Plaintiff, the modification "never seemed to be a problem." (Id. at 109.) These facts are undisputed. Therefore, it is clear that whatever dangerous condition the roller may have been in because of the modified propulsion lever, the owner, the operator, and the victim of the roller were all was aware of that danger. The Plaintiff himself was the individual on the site responsible for the work being done by the Richard's Paving crew, including the operation of the roller he knew to have directional modification of which he now complains.

Plaintiff alleges that defendant Branscome owed him a duty to warn under *§ 388 of the Restatement (Second) of Torts* because Branscome "was the supplier of a defective chattel. [*15] " (D.I. 74 at 8.) All parties acknowledge that Delaware has not conclusively adopted *§ 388 of the Restatement (Second) of Torts*. Although the Delaware Supreme Court has not ruled on this issue, there are indications that the court would apply *§ 388 of the Restatement (Second) of Torts* to determine the scope of such duty. *See In re Asbestos Litigation (Mergenthaler), 542 A.2d 1205, 1209 (Del. Super. Ct. 1986)* (discussing the "sophisticated purchaser" defense in the context of *§ 388 of the Restatement (Second) of Torts*); *Daniels v. Atl. Refining Co., 295 F. Supp. 125, 130 (D. Del. 1968)* (finding that a Delaware court would follow the principles of *§ 388 of the Restatement (Second) of Torts* when faced with a question involving the duty to warn); *Cropper v. Rego Distribution Center, Inc., 542 F. Supp. 1142, 1152 (D. Del. 1982)* (discussing the duty to warn in the context of *§ 388 of the Restatement (Second) of Torts*). Assuming for the sake of argument that Delaware would adopt this section, it is clear that Plaintiff has still failed to establish that Branscome or Mitchell owed him a duty to warn in this case.

Restatement (Second) [*16] of Torts *§ 388*, entitled: "Chattel Known to be Dangerous for Intended Use," provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

*RESTATEMENT (SECOND) OF TORTS § 388* (1965).

If Delaware were to adopt this section of the Restatement, it would also adopt the "sophisticated user" defense included in that section. *Section 388, subsection (b)*, "embodies the sophisticated user doctrine, ... [which is described] as imposing no duty to warn *if the user knows* or should know [*17] *of the potential danger*, especially

2004 U.S. Dist. LEXIS 20574, *; CCH Prod. Liab. Rep. P17,172

when the user is a professional who should be aware of the characteristics of the product." *Haase v. Badger Mining Corp., 266 Wis. 2d 970, 669 N.W.2d 737, 743, 2003 WI App 192 (Wis. Ct. App. 2003)* (emphasis added) (internal citations and quotations omitted); *see, e.g., Kennedy v. Mobay Corp., 84 Md. App. 397, 579 A.2d 1191, 1194-1200 (Md. Ct. Spec. App. 1990)* (recognizing the sophisticated user defense); *Gray v. Badger Min. Corp., 676 N.W.2d 268, 276-77 (Minn. 2004)* (recognizing the sophisticated user defense).

It is clear that, in this case, the Plaintiff knew of the potential danger resulting from the modification of the propulsion lever. Mr. Cervantes, the operator of the roller, and Plaintiff, the site supervisor, frankly admitted that they were aware of the modified operation of the roller. Therefore, Plaintiff has failed to establish that Branscome or Mitchell n4 owed him a duty to warn.

n4 With regard to Mitchell, the Plaintiff's claims of negligence and loss of consortium against it are identical to the claims made against Branscome (D.I. 1 Att. 1 at 5-12). Moreover, arguments and defenses raised by Mitchell in his Motion for Summary Judgment are substantially the same as those raised by Branscome. (*See,* D.I. 66; and D.I. 68.) Consequently, for the same reasons discussed above Mitchell's Motion for Summary Judgment is granted.

[*18]

Having concluded that summary judgment should be granted for both defendants, it is not necessary for me to consider Mitchell's Motion to Exclude the testimony of Douglas Brooks. n5

n5 *See* note 3, *supra.*

## V. CONCLUSION

Because of the lack of evidence provided by Plaintiff, the speculation regarding when the modification to the propulsion lever occurred, and the lack of a duty to warn Plaintiff, both Branscome's Motion for Summary Judgment (D.I. 66) and Mitchell's Motion for Summary Judgment (D.I. 67) will be granted. Mitchell's Motion to Exclude the Testimony of Douglas Brooks (D.I. 69) will be denied as moot. An appropriate order will follow.

### ORDER

In accordance with the Memorandum Opinion issued today, it is hereby ORDERED that the Defendants' Motions for Summary Judgment (D.I. 66; D.I. 67) are GRANTED. Defendant Mitchell Distributing Company, Inc.'s Motion to Exclude the Testimony of Douglas Brooks (D.I. 69) is denied as moot.

Kent A. Jordan
UNITED STATES DISTRICT JUDGE

Wilmington, [*19] Delaware
October 8, 2004