IN THE DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| APRIL BAYLIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 04-1462-KAJ |
| | : | |
| RED LION GROUP, INC., a corporation | : | |
| of the State of Pennsylvania, | : | |
| | : | |
| Defendant. | : | |

## **APPENDIX TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR**

## **SUMMARY JUDGMENT**

Bayard Marin
The Law Offices of Bayard Marin
521 West Street
Wilmington, DE 19801
302-658-4200
Attorney for Plaintiff

Dated: August 30, 2005

## TABLE OF CONTENTS

Relevant Portions of Deposition Transcript of Thomas O'Hanlon......................A-1

Relevant Portions of Deposition Transcript of Elton Vincent...........................A-5

Relevant Portions of Deposition Transcript of Patrick Gerald McCarthy.............A-14

Relevant Portions of Deposition Transcript of April Baylis…………...………...A-37

Relevant Portions of Deposition Transcript of John Peters…………………..…..A-43

Affidavit of Rus Davis…………………………………………………...…..A-51

Affidavit of Charles McClain……………………………………………………A-54

THOMAS O'HANLON

1      A    It would depend on what test is being

2 performed.

3      Q    Well, what kind of tests are there?

4      A    There's an annual test.  There's a

5 six-year maintenance test.  There's the hydro test.

6      Q    Before --

7      A    Or -- I can't remember.  It's either five-

8 or six-year maintenance.  I'm sorry.

9      Q    Before the fire extinguishers were sent

10 out on rental, were they inspected?

11      A    I don't have any knowledge of whether they

12 were or not, because I wasn't involved in renting them

13 at all.

14      Q    You weren't involved in that aspect of Red

15 Lion?

16      A    No.

17      Q    Now, on a fire extinguisher of the type

18 that I put in front of you there, on those type of

19 fire extinguishers, which are CO2 extinguishers, when

20 in proper use, CO2 should only come out of the end of

21 the cone; is that correct?

22      A    Yes.

23      Q    If CO2 comes out of anywhere other than

24 the end of the cone, is that not a malfunction of the

THOMAS O'HANLON
9

1   fire extinguisher?

2       A    Not necessarily.   It could have been that

3   it was damaged by something.   Could have been dropped.

4   I mean, I wouldn't call it a malfunction of the

5   extinguisher.

6       Q    If the extinguisher is used and $CO_2$ comes

7   out of anywhere other than the end of the cone, is

8   that not a malfunction of that extinguisher?

9           MR. BROOKS:   I'm going to object.

10  The question has been asked and answered.   I mean, if

11  you're -- it's also seems to be --

12  BY MR. MARIN:

13      Q    Assuming if it were not dropped.

14      A    Again, my definition of "malfunction" is

15  that it mechanically malfunctioned.   If $CO_2$ comes out,

16  it's functioning.

17      Q    But if $CO_2$ comes out of anywhere other

18  than the end of the cone, isn't that a malfunction?

19      A    Can be.   Again, I think I've answered what

20  my opinion is on that.   To me, a malfunction is that

21  it would not discharge.   If it's discharging, it's

22  functioning.

23      Q    It's functioning.   Is it safely

24  functioning when $CO_2$ leaks out of anywhere other than

A-2

1    the end of the cone?

2        A    I can't speak to that.  I don't know.  It

3    depends on how much is leaking.

4        Q    If $CO_2$ leaks on someone's hand, isn't that

5    a malfunction of the fire extinguisher?

6                    MR. BROOKS:  Same objection.

7    BY MR. MARIN:

8        Q    You can answer.

9                    MR. BROOKS:  You can answer if your

10   answer is any different than what it was before.

11                   THE WITNESS:  It's not.

12   BY MR. MARIN:

13       Q    Under what circumstances can a fire

14   extinguisher of that type leak without it being a

15   malfunction?

16       A    I can't answer that question.

17       Q    Why can't you?

18       A    It's not my expertise.

19       Q    Now, you have O'Hanlon 1, that exhibit; is

20   that correct?

21       A    Yes.

22       Q    Now, in the second sentence of the second

23   paragraph you say, "With a $CO_2$ extinguisher, if the

24   full valve sticks, the $CO_2$ can escape at a very low

1  rate.  You would not hear it or see it.  In the

2  future, please bring instances such as this to our

3  attention prior to our invoicing you."

               How did you come to that opinion?

5       A    I would only be speculating how I came to

6  it if I told you.

               But generally speaking, I would have

8  gone to the manager and asked them what would cause

9  this, because they're the persons that are expert in

10  that area.  So they would have told me, This is what

11  would have caused it.

12      Q    So this was not your opinion?

13      A    No.

14      Q    This is what you were told by someone?

15      A    That would have been normal procedure.

16      Q    Who was the manager that you spoke to

17  about this?

18      A    I do not remember.  But the manager should

19  have been Craig Ulshafer.

20      Q    C-R-A-I-G?

21      A    Yes, Craig Ulshafer.

22      Q    A-L --

23      A    U-L-S-H-A-F-E-R, I believe.

24      Q    From personal knowledge, you have no idea

A-4

ELTON H. VINCENT

5

1  November 14, 2002, involving a lady named April

2  Baylis?

3       A    I remember such an incident.  I don't

4  remember the exact date, but I remember -- I think it

5  was November of 2002.

6       Q    Right.  Now, on -- I have a letter here

7  dated November 25, 2002.  I don't have more than one

8  copy of this.  But -- and you were corresponding with

9  a Mr. Davis?

10      A    Mr. Davis.

11      Q    At Red Lion -- excuse me.  At Honeywell?

12      A    He's the gentleman that called with the

13  problem.  He's the gentleman that called -- the call

14  was given to me.  I corresponded back and forth with

15  Mr. Davis a little bit and that was it.

16      Q    Okay.  What do you recall about the,

17  quote, problem, unquote?

18      A    What I recall is Mr. Davis called, said

19  that they were doing some -- using some extinguishers

20  on training; they were doing the training themselves.

21            They used some of our extinguishers.

22  There was an extinguisher that malfunctioned, did not

23  operate correctly, and someone got $CO_2$ on their hands

24  or whatever.

A-5

ELTON H. VINCENT

Q     Uh-huh.

A     This extinguisher would be charged through this horn, through the nozzle.  The valve would be held open.  CO2 would be put into the extinguisher sitting on a scale.  Get to the proper weight; it's let go.  The pin is put into the seal, and it's ready to be used.

Q     Is the horn and the piping that leads to the horn taken off during the charging procedure?

A     No, just the cone.  This cone is taken off.

Q     The cone is taken off.

A     And the CO2 line used for recharging is hooked here.  The valve is open; the CO2 is pumped in. After it's full to the right weight, stop; the horn is put back on.

Q     Now, in maintenance of these fire extinguishers, and particularly this kind of fire extinguisher, is the nut that is between the housing and the piping, which is called the -- what is the official title of that nut?

A     Couldn't tell you.  Couldn't tell you. It's just a nut.

Q     Referred to as a wedge nut?

A-6

ELTON H. VINCENT

8

1    A    A wedge nut?  No, I doubt it.  It's just a

2  nut.  I don't know the nomenclature.

3    Q    Pressure nut?

4    A    There's -- this is a -- this has to do

5  with the relief of pressure here, this nut.

6    Q    Okay.

7    A    If the pressure builds up in this

8  extinguisher higher than what it should be, it will

9  blow CO2 out this nut all by itself.  You don't have

10 to do anything.

11           These cylinders are 1800 psi.  It

12 gets above that -- this is a safety disc.  The safety

13 disc will rupture and blow the CO2 out.

14    Q    Okay.  But that would happen prior to

15 release of the CO2 using the handle; correct?  In

16 other words, in the plan --

17    A    It wouldn't normally happen if you're

18 using the extinguisher.

19    Q    Right.  So that wouldn't happen in any

20 kind of use of the extinguisher?

21    A    Should not.  I don't believe it should.

22 I've never seen it happen.

23    Q    So when -- so if CO2 would come out of

24 this pressure nut area, that would be because it was

A-7

1    being filled in the plant and too much pressure was

2    put in; is that correct?

3         A    This would be kept in a boiler room or

4    somewhere where it's too hot.

5              If the temperature builds up in this

6    cylinder for whatever reason, whatever reason -- this

7    is a safety disc. When this disc goes at a certain.

8    pressure, the 1800 psi, I believe it is -- don't hold

9    me to that. Again, I haven't been involved in the

10   day-to-day operation of CO2, or any extinguishers, for

11   20 years.

12        Q    But on a cold day with a fire extinguisher

13   outside, you wouldn't expect --

14        A    This --

15        Q    -- the pressure to --

16        A    This should have -- this should have

17   nothing to do with it, as far as I can tell.

18        Q    You have to wait for me to finish the

19   question, only because she has to record it, and we

20   want to make sure that it's the accurate recording.

21        A    I'm sorry.

22        Q    Is the nut between the piping and the

23   housing of the fire extinguisher ever taken off in

24   maintenance of the fire extinguisher?

A-8

ELTON H. VINCENT                                    11

1    extinguisher used on a training class or a

2    demonstration.  I think we just went through this.

3                    And I told him to tag the

4    extinguisher and send it in, we would look at it.

5        Q    And this one extinguisher, was this the

6    only one tested?

7        A    The only one that I looked at.  There may

8    have been others tested.  If any of them were empty,

9    they had to refill them.

10                   And again, there's four trucks that

11   come in.  They put all these extinguishers in a pile.

12   I don't know which ones were which.  That's why I told

13   him to tag this extinguisher that there was a problem.

14   And that's the extinguisher that I looked at.

15                   (Discussion off the record.)

16   BY MR. MARIN:

17       Q    Did you have anything to do with the sale

18   of the fire extinguisher to --

19       A    No.

20                   MR. BROOKS:  No. 1, you have to wait

21   for him for the question to be asked, even if you

22   think you know.

23                   No. 2, I object to the question.

24   You're assuming it was a sale?

A-9

ELTON H. VINCENT
14

1     Q    To the extent that you can answer the

2  question -- what inspection --

3     A    They would be inspected according to

4  NFPA-10 regulations.  All the service people go

5  through them to understand what the regulations are.

6  That's a weighing and inspecting, according to the

7  type of the extinguisher.

8     Q    Do you know who inspected these particular

9  extinguishers?

10    A    No, I do not.

11    Q    Feel free to look at that letter.

12         In the letter from Mr. Davis back to

13  you, it says, "After I received your letter dated

14  11/25/02 describing only the fire extinguisher that

15  was tagged, I must say I was disappointed.  I felt

16  that I had gone through great lengths to inform you

17  that all three of the five-pound extinguishers should

18  be inspected.  Honeywell is concerned that there may

19  be a defective fire extinguisher in circulation that

20  could potentially injure someone else."

21         Did you respond to Mr. Davis about

22  this?

23    A    Mr. Davis talked about the other

24  extinguishers at a later date.  After our normal --

ELTON H. VINCENT

1    whatever this chain of events was.

2              When we talked, I told Mr. Davis to

3    tag the extinguishers.  He tagged the extinguisher.

4              The other extinguishers we

5    weren't -- weren't concerned with -- I wasn't

6    concerned with.  I was concerned with the extinguisher

7    that leaked.  The other extinguishers came up and went

8    in with all the others, and I felt that we had checked

9    the extinguisher that he talked about, and that was

10   it.

11        Q    So --

12        A    I didn't check the others.

13        Q    Right.  They weren't checked so they may

14   or may not have leaked?

15        A    That's correct.  They weren't checked by

16   me, in my presence.

17        Q    Now, during the operation of a fire

18   extinguisher -- and particularly this five-pound fire

19   extinguisher.  During operation of the fire

20   extinguisher, should CO2 come out of the fire

21   extinguisher in any place but the end of the nozzle,

22   the end of the cone?

23        A    No.

24        Q    If CO2 comes out of the fire extinguisher

A-11

ELTON H. VINCENT

1    in any place other than the end of the cone, is that a

2    defective fire extinguisher?

3        A    The mechanical --

4        Q    During operation.

5        A    The mechanical devices, anything can go

6    wrong.  I would say there's something wrong if it

7    comes out anywhere except the horn.

8        Q    So that's defective; correct?

9        A    I guess you would use the word

10   "defective."

11       Q    Now, a fire extinguisher, like a

12   five-pound fire extinguisher, is for use, say, in an

13   office setting; is that correct?

14       A    This is used -- there's Class B and

15   Class C fires.  They're flammable liquid and

16   electrical.

17            In an office, you wouldn't use

18   something like this, because it would not put out a

19   fire in your rugs or your carpeting or whatever.

20       Q    But when a fire extinguisher such as this

21   is used, wherever it's used, a fire comes up usually

22   as an emergency situation; correct?

23       A    Yes, normally.

24       Q    Right.  And normally a person around the

A-12

Elton H. Vincent                                                December 19, 2002
Director of Service & Training
Red Lion Group, Inc.
500 Red Lion Road
Philadelphia, PA 19115-1198

RE: Fire extinguisher Report 11/20/02

Dear Mr. Vincent,

I would like to thank you for the concern and effort that you have shown in working with us in regard to investigating the incident with one of the loaner fire extinguishers.

While we have had numerous conversations throughout this process, I would like to reiterate some of Honeywell's concerns. I would also like to point out that the person conducting the training is a long time veteran firefighter and former president of the Claymont, DE Fire Company.

As you are aware, on Wednesday, 11/13/02, Honeywell received a delivery of 21 fire extinguishers to be used in training the next day. The incident occurred while using a 5-lb. $CO_2$ extinguisher (one of three delivered). The fire extinguisher in question was set aside and photographed. The fire extinguishers were then moved to our loading dock for pick-up the following day, Friday 11/15/02. When the fire extinguishers were moved to the loading dock the extinguisher in question was mixed with the other two of the same type. While on the loading dock, I placed a "Danger - DO NOT USE" tag on the extinguisher I believed to be involved in the incident. However I was not sure.

When we spoke on Monday 11/18/02, if you recall, I informed you that I had tagged a fire extinguisher, even though I was not sure if it was the correct one, and that I would recommend that all three be thoroughly inspected. At that time, you asked me to send a copy of our incident report. The report was sent on 11/22/02.

After I received your letter dated 11/25/02, describing only the fire extinguisher that was tagged, I must say I was disappointed. I felt that I had gone to great lengths to inform you that all three of the 5-lb. extinguishers should be inspected. Honeywell is very concerned that there may be a defective 5-lb. fire extinguisher in circulation that could potentially injure someone else. As you recall after receiving your letter, I reiterated Honeywell's concern. During our conversation you did mentioned that the extinguishers received from us were mixed in with others at Red Lion Group's unloading area and that you would continue to look for the defective fire extinguisher.

02063f@11-17 CO2 Burn let                                      Page 1 of 2

Δ π EXHIBIT 2
Deponent Vincent
Date 6-29-05 Rptr.
WWW.DEPOBOOK.COM

A-13

Page 23

1    would have been moved out to the

2    boneyard.

3         Q.    Do you know for a fact that

4    the fire extinguishers were accepted in

5    the storeroom?

6         A.    They were kept until that

7    morning, yes.

8         Q.    How do you know where the

9    fire extinguishers were kept that night?

10        A.    I remember the question of

11   how we were going to get them from the

12   storehouse to the boneyard.

13        Q.    Who did you discuss that

14   with?

15        A.    My boss.

16        Q.    Who was?

17        A.    Jeff Boyle.

18        Q.    What's Mr. Boyle's job

19   title?

20        A.    Maintenance supervisor.

21        Q.    How was that resolved, the

22   issue of transporting them from the

23   storeroom to the boneyard?

24        A.    I believe we got a cart with

A-14

1    sides on it and put them inside there and

2    pushed the cart out.

3         Q.    Can you describe the cart

4    for me?

5         A.    Basic cart of three-foot

6    wide, four-foot long, just a basic

7    utility style cart to push materials.

8         Q.    I'm not quite sure what a

9    basic cart is.  Is it four wheels or two

10   wheels?

11        A.    Oh, I'm sorry.  Four wheels,

12   utility cart handle that you just kind of

13   lean against and push the handle -- four

14   wheels, lean against the handle, metal

15   construction.

16        Q.    Is it similar to a cart that

17   you would use at a Home Depot or a Lowe's

18   or something like that?

19        A.    Yes.

20        Q.    Got it.  Than you.  Are

21   there any sides on that cart other than

22   the very back?

23        A.    This cart that we had had a

24   small four inch.

A-15

Page 25

1          Q.     Who transported them from
2    the storeroom to the boneyard?
3          A.     I don't know that one.  To
4    the best of my knowledge I don't know who
5    transported them that day.
6          Q.     But you recall discussing it
7    with Mr. Boyle?
8          A.     Yes.
9          Q.     What was that discussion?
10          A.     Who's taking them out back.
11          Q.     Other than not you, you
12    don't know --
13          A.     I don't know.  The fire
14    extinguishers were unloaded to the back
15    of the loading dock and it was a busy
16    morning and we just knew that somebody
17    had to get the extinguishers out back.
18          Q.     So someone brought them from
19    the storeroom to the loading dock or
20    directly from the storeroom --
21          A.     I'm sorry, the storeroom and
22    the loading dock is the same building.
23    The loading dock is in the back of the
24    building.  The building is approximately

A-16

Page 26

1    40 foot in length and the front end is

2    the storehouse.

3            Q.    Do you know who transported

4    the Red Lion fire extinguishers from the

5    loading dock to the storeroom when they

6    were received the day before safety day?

7            A.    The loading dock and the

8    storeroom are the same building but I do

9    not know who transported them from the

10   receiving/storehouse building to the

11   boneyard where we had the training that

12   day.

13           Q.    Do you know who received

14   them on behalf of Honeywell?

15           A.    I would have to assume that

16   the receiver that day was John Garzia,

17   G-A-R-Z-I-A, because he works the

18   receiving/storehouse.   That's his primary

19   job.

20           Q.    Do you know whether he

21   inspected the fire extinguishers at the

22   time that they were received?

23           A.    No, sir.

24           Q.    On safety day did you have a

A-17

Page 30

```
 1    at that time?
 2         A.    Yes, sir.
 3         Q.    Do you recall who the other
 4    instructor was that was on with you at
 5    the time the employees first started
 6    passing through the pan area that
 7    morning?
 8         A.    I don't recall if John was
 9    there for the very first group or not.
10    No.  I might have been by myself for the
11    first group.
12         Q.    When you arrived at the pan
13    area were the fire extinguishers already
14    delivered to the pan area?
15         A.    Yes, sir.
16         Q.    I take it you don't know how
17    they got there?
18         A.    No.
19         Q.    How many fire extinguishers
20    were in that group, if you know?
21         A.    I would have to approximate
22    between 14 and 20.
23         Q.    Did you have any way to
24    differentiate the fire extinguishers that
```

A-18

Page 31

1    were Honeywell owned fire extinguishers

2    from the ones that were provided by the

3    Red Lion Group?

4          A.    Yes.  Red Lion Group's --

5    Honeywell's extinguishers were not to be

6    used at all that day.  We intentionally

7    made contact with the vendor to supply

8    extinguishers for safety day so that we

9    would not deplete ours at the plant.

10               When they were delivered

11    they were kept in the receiving area

12    where we do not store our extinguishers.

13    And to the best of my knowledge they were

14    took from that area to the spot where we

15    were having training that day.

16          Q.    Where were they when you

17    first found them?

18          A.    I first noticed them in the

19    morning, they were in the receiving area

20    and then when I went pack to start

21    preparing for students to come through

22    they were already there.  They were

23    already transported from the receiving to

24    the setup area.

A-19

Page 47

1    to Laurie, asked her if she was ready,
2    she said yes.  She then pulled the pin,
3    squeezed the trigger and I walked up
4    beside Laurie while she extinguished the
5    pan.
6                    Then actually Laurie had one
7    small mistake.  She turned her back on
8    the fire.  I reminded Laurie to never
9    turn her back on the fire to walk away
10   backing up.  She did so.  Since the
11   extinguisher was used I asked her to put
12   it to the side.
13                   April then grabbed an
14   extinguisher, walked up.  I asked her if
15   she was ready to go.  She said yes.  I
16   went up, I reignited the pan with the
17   flare that was still lit, set the flare
18   to the side again, walked back to April.
19   April then pulled the pin to an
20   extinguisher, squeezed the trigger, the
21   extinguishing agent came out of the side
22   of the extinguisher onto her hand instead
23   of the nozzle.
24                   She startled, released the

A-20

Page 48

```
 1    nozzle and there's a little confusion
 2    right there of like whoa, what was that?
 3    She brushed off her hand, set that
 4    extinguisher to the side, not with the
 5    other ones, grabbed another extinguisher,
 6    extinguished the fire, backed out and at
 7    that time we looked at her hand and John
 8    Peters and I advised her to go back to
 9    the office and run some warm water over
10    it and that was the last that I saw of
11    her.
12          Q.    Since then have you had any
13    more discussions with April about how the
14    incident happened?
15          A.    No.  I just asked her how
16    her hand was.
17          Q.    When was that?
18          A.    Off and on for the last two
19    years.  From 2002 to 2004 before she took
20    a leave of absence.
21          Q.    When was the last time you
22    asked her how her hand was doing?
23          A.    I honestly -- I would be
24    guessing if I gave you an answer.  I
```

A-21

Page 50

1    employees?

2          A.    No, sir.

3          Q.    Was there any business

4    purpose to that or was that just sort of

5    in the course of --

6          A.    Honeywell has reconfigured

7    how they do fire extinguisher training

8    and I didn't agree with it.

9          Q.    How has it been

10   reconfigured?

11         A.    The employee will now use

12   gloves, leather gloves and a safety

13   shield for training.  Oh, and a fire

14   jacket.

15         Q.    Why did you not agree with

16   that?

17         A.    Because it's not practical.

18   In the event of a fire you're going to

19   grab a fire extinguisher, you're going to

20   extinguish it, you're not going to grab

21   or have the availability to grab this

22   equipment.  Plus the leather gloves were

23   the wrong style gloves.

24         Q.    When did they start doing

A-22

Page 51

1      the training this way?

2            A.      After the Baylis incident.

3            Q.      So that would be the safety

4      day in '03?

5            A.      Yes, sir.

6            Q.      They did it that way in '03,

7      '04 and '05?

8            A.      Yes, that's what they tell

9      me.  I chose no longer to participate in

10     the extinguisher training.

11           Q.      Did you participate in '03?

12           A.      No.

13           Q.      Why was that?

14           A.      Difference of opinions with

15     the safety department.

16           Q.      About that equipment that

17     you just discussed?

18           A.      The difference of equipment

19     and just personal, just didn't feel like

20     participating.  Just personal preference.

21           Q.      Well, I'm trying to figure

22     out what the personal preference was

23     based on.  Was it based on the fact that

24     they were in '03 implementing these

A-23

Page 52

1    changes?

2         A.    No.  It was just still my

3    ability to get over an injury.

4         Q.    An injury to you unrelated

5    to this incident?

6         A.    No.  An injury that I didn't

7    -- I had an employee get hurt.  Now, it

8    had nothing to do with my instruction, it

9    had nothing to do with our -- Honeywell's

10   equipment.  It was in my personal -- just

11   in my opinion it was just a faulty

12   extinguisher that day at the time that we

13   used it.

14              I didn't like the fact that

15   somebody got hurt so I just chose to step

16   aside for a year or two or three.  And

17   then to compound the issues I didn't

18   agree with the line of training that they

19   put forward.

20              I like to train in realistic

21   situations and I felt that the extra

22   safety equipment was making the training

23   unrealistic.

24        Q.    Did you have an opportunity

A-24

1    to look at the fire extinguisher after

2    the incident?

3         A.    Yes, sir.

4         Q.    Were you able to appreciate

5    any defect in the operational hardware of

6    the fire extinguisher?

7         A.    The extinguisher appeared to

8    be in good working order after inspection

9    of Ms. Baylis.

10        Q.    When she had initially

11   squeezed the trigger of the first

12   extinguisher did you see any CO2 leave

13   from the form?

14        A.    A little bit.  A little bit

15   left of the horn, which is the intended

16   area for it to be displayed.  But a

17   larger portion seemed to come out of the

18   right angle piping where it attaches to

19   the extinguisher.

20        Q.    Was April Baylis

21   right-handed or left-handed?

22        A.    My recall is that she was

23   squeezing the handle of the extinguisher

24   with her right hand and would move the

1    nozzle with her left.

2          Q.    After she extinguished the

3    fire did you ever see any $CO_2$ on either

4    hand?

5          A.    No.

6          Q.    While she was using the

7    extinguisher, that is the first

8    extinguisher, did you see any $CO_2$ leave

9    any place other than the horn?

10         A.    Yes.

11         Q.    Where did that $CO_2$ go?

12         A.    It appeared that a larger

13   portion of $CO_2$ left where the piping and

14   the nozzle -- or the piping and the

15   handle area of the extinguisher and a

16   large portion of that went onto her left

17   hand.

18         Q.    I thought I just asked you a

19   minute ago did you see any $CO_2$ on her

20   hand?

21         A.    The $CO_2$ won't -- it will

22   evaporate into the area quite quickly.

23         Q.    When you saw it leaving the

24   piping area, which you talked about

A·26

Page 55

1    earlier, what did it look like?

2         A.    It would remind you of like

3    a dry ice.  It's a white cloud.

4         Q.    When you looked at April's

5    hand after the incident did you see any

6    change in the skin?

7         A.    There was a large area of

8    red.

9         Q.    A large area of redness on

10   what part of the hand?

11        A.    The top of her left hand in

12   between the thumb and the forefinger.

13   The thumb is the number one right on down

14   to number two.

15        Q.    So it would be in the area

16   of the thumb and the two fingers that you

17   use for the piece sign?

18        A.    Yes.

19        Q.    That was on the palm side of

20   the hand or the opposite side of the

21   hand?

22        A.    The portion that I noticed

23   was on the top side, not the palm, the

24   underneath.  What I consider the

A-25

Page 64

1    the time April got there, correct?

2           A.    Yes, sir.

3           Q.    Do you know whether those

4    fire extinguishers were provided by the

5    Red Lion Group or were they provided by

6    someone else?

7           A.    I don't know that one.

8           Q.    You indicated earlier that

9    you could get two uses out of certain

10   fire extinguishers, is it your testimony

11   now that the particular size fire

12   extinguisher that April was using you

13   could not get two uses out of it?

14          A.    I would not attempt to get

15   two uses out of that extinguisher, no,

16   sir.

17          Q.    Do you know whether you got

18   two uses out of any of those size fire

19   extinguishers before this event?

20          A.    I would not try -- the

21   smaller extinguishers once the employee

22   was done extinguishing that fire I would

23   just empty out.

24          MR. BROOKS:   Let's go off

A-2

Page 65

1              the record for a second.

2                      -   -   -

3              (Discussion held off the

4          record.)

5                      -   -   -

6    BY MR. BROOKS:

7              Q.    Is it your testimony this

8    morning that the fire extinguisher that

9    April was using, whether it was a five

10   pound or ten pound, that that size fire

11   extinguisher you would not get two uses

12   out of it?

13             A.    Yes, sir.   I would not even

14   attempt to utilize that extinguisher

15   twice.

16             Q.    Do you know whether any

17   effort was made to inspect the fire

18   extinguishers once they were received at

19   Honeywell?

20             A.    I do not know that answer,

21   no, sir.

22             Q.    Once they were moved from

23   storage to the boneyard was any effort

24   made to inspect them at that point?

A-29

Page 66

1          A.     Not that I'm aware of, no,
2     sir.
3          Q.     I think Mr. Peters said this
4     morning that he made no inspection of the
5     fire extinguishers at the boneyard that
6     morning, did you make any inspection of
7     the fire extinguishers that morning?
8          A.     I did a brief inspection to
9     check the tags and the gauges of the
10    extinguishers that had gauges and a
11    visual of the dry chems to make sure that
12    they were good.
13               On a dry chem once the
14    extinguisher is activated a little red
15    button pops up on the side up in the top
16    of a window and I just did a glance over,
17    a very brief inspection to make sure that
18    there was no red indicators popped up.
19         Q.     Are the dry chems only good
20    for one use or can the dry chems be used
21    more than once?
22         A.     Training or in actual fire
23    suppression?
24         Q.     Training.

A-30

Page 67

```
 1        A.      Training, larger
 2   extinguishers that you would find in the
 3   manufacturing area of the plant we could
 4   utilize for two training evolutions.  The
 5   smaller ones we would not.
 6        Q.      Based on your inspection of
 7   the fire extinguisher after the incident,
 8   if you had given it a complete and
 9   thorough visual inspection before April
10   used it do you have an understanding of
11   whether or not you would have been able
12   to see any defect or any unusual
13   condition in the fire extinguisher had it
14   been inspected before the event?  Do you
15   understand the question?
16        A.      Yes, sir.  My answer to that
17   question would be is from when I saw
18   where the CO2 had came out, if I had
19   inspected that prior to the use of Ms.
20   Baylis I would not think that I would
21   have noticed anything that would have
22   told me not to use that extinguisher for
23   that day.
24        Q.      Did this particular fire
```

A-31

Page 68

1    extinguisher have a gauge on it?

2        A.    It should have, yes, sir.

3        Q.    What did the gauge read, if

4    you know?

5        A.    I don't know exactly if it

6    had a gauge.  It should have a gauge

7    because that's the only way you know if

8    an extinguisher is good or been

9    discharged and I would have recollected

10   it would have been in the good.

11       Q.    I don't want to put words in

12   your mouth, but my understanding of your

13   testimony is that you inspected the fire

14   extinguishers, at least the gauges of

15   them, that morning and based on your

16   inspection of the gauges none of the

17   gauges displayed any information that

18   suggested to you that any of them were

19   not ready for use.

20       A.    I looked over the

21   extinguishers that we had there for

22   training and all the gauges were in the

23   good portion of the gauge and there was

24   no red indicators discharged up in the

A-32

Page 69

1    larger dry chem extinguishers.

2         Q.    So all of the gauges were in

3    order, in good condition?

4         A.    Yes, sir.

5         Q.    None of the gauges suggested

6    to you that any of the fire extinguishers

7    were either defective or not ready for

8    use?

9         A.    No, sir.  Correct.

10        Q.    Same question with respect

11   to the information that you gleaned from

12   the tags, did every fire extinguisher

13   have the appropriate tag on it?

14        A.    I can't say that every fire

15   extinguisher had the appropriate tag.  I

16   just glanced down and looked at a few of

17   the tags and they just had inspections

18   and everything looked in good working

19   order that day.

20        Q.    Of all of the tags that you

21   looked at that morning were any of them

22   out of order?

23        A.    No, sir.

24        Q.    So all of the paperwork was

A-33

Page 70

1    current?

2         A.     All the tags that were

3    associated with each extinguisher

4    appeared to be updated and proper, yes.

5              MR. BROOKS:  Thank you.

6         That's all I have.

7                   -   -   -

8                 EXAMINATION

9                   -   -   -

10   BY MR. MARIN:

11        Q.     I asked counsel for Red Lion

12   to bring with him to the deposition a

13   couple fire extinguishers that are the

14   same or similar to the ones that were

15   used that day.  Now, looking at these

16   extinguishers, are those similar to the

17   ones that April Baylis used?

18        A.     Yes, sir.

19        Q.     That size?

20        A.     They were the smaller --

21   smallest style extinguisher of CO2, yes.

22        Q.     Now, you've described

23   somewhere, or someone described in a

24   report, that the fire extinguisher, the

A.34

Page 71

1    CO2 leaked from an area where the wedge

2    nut screws into the assembly, could you

3    point out a wedge nut on these fire

4    extinguishers?

5            A.    What I consider the wedge

6    nut would be -- if I can use the pen,

7    would be where the piping screws into the

8    handle and there is what I consider a

9    compression fitting that goes down around

10   the piping that goes to the cone of the

11   extinguisher.

12           Q.    Is that the area where you

13   saw the leak?

14           A.    Yes, sir.

15           Q.    This variously has been

16   described as a nozzle, is this the horn

17   which you call the nozzle?

18           A.    The black area at the end of

19   the extinguisher, different people have

20   different names.  A cone is one name

21   usually used for some of the larger

22   extinguishers.  The nozzle some people

23   refer to it, but it is the end of the

24   extinguisher that's plastic in

A-35

Page 72

```
 1    construction used where the extinguishing
 2    agent comes out of the fire extinguisher.
 3          Q.    Right.  Now, when in use the
 4    CO2 is to come out of the end of the
 5    horn, right?
 6          A.    Yes, sir.
 7          Q.    The CO2 is not to come out
 8    of the housing to the fire extinguisher?
 9          A.    Not in a properly
10    functioning fire extinguisher.
11          MR. MARIN:  I have no
12          further questions, sir.
13          MR. BROOKS:  Sir, you have
14          the right to read your deposition
15          transcript before it becomes an
16          official court document.  The
17          court reporters we use generally
18          do very accurate work so many
19          times a witness will waive that
20          right.  You have the right to read
21          it or you can waive that right.
22          THE WITNESS:  I'm okay.
23    I'll waive that right, yes, sir.
24          MR. BROOKS:  Very good.
```

A·36

18

```
 1          A.     Yes, sir.

 2          Q.     -- Las Vegas --

 3          A.     No; in Maryland.

 4          Q.     And what was the first job you

 5     had when you returned to Delaware in '02?

 6          A.     I worked at a temp agency for

 7     two months at Honeywell, which is where I

 8     ended up permanent.

 9          Q.     When did you start at

10     Honeywell --

11          A.     July 16.  That was my start,

12     temporary.  My permanent was September 16,

13     2002.

14          Q.     And what was your job title or

15     job description originally?

16          A.     Office coordinator.

17          Q.     Is that what it was at the

18     time of this accident?

19          A.     That's correct.

20          Q.     Is that what it is now?

21          A.     Yes, sir.

22          Q.     What does the office

23     coordinator do?

24          A.     I book travel, scheduling
```

A-37

82

1          A.     We were -- I would say

2    probably, yes.  We were trying to do

3    everything that we could before we got to

4    that point.  I didn't particularly want to

5    have that done, but nothing is working so

6    it's pointing in that direction.

7          Q.     Let me take you back to the

8    incident on November 14, 2002.  Prior to

9    that date, had you ever had any formal

10   training on fire extinguishers?

11         A.     Not formal; no.  That date,

12   yes.  But before that, no.

13         Q.     Of the companies that you've

14   worked for throughout your career, is this

15   the first one that ever provided you any

16   formal training where you had hands-on

17   training with the fire extinguisher?

18         A.     I believe so; yes.

19         Q.     What time did you report for

20   work that day?

21         A.     I always go to work at 7:00.

22         Q.     Did you have a complete

23   night's rest the night before?

24         A.     I'm sure.  I sleep well.

A-38

102

1    at the point where he lights the fire, is

2    your extinguisher already in your hand or

3    is it on the ground?

4         A.    It's on the ground.  He lights

5    the fire.  You pick up the extinguisher and

6    pull the pin, sweep, and it's called PASS.

7         Q.    What's called PASS?

8         A.    The steps that you take.  It's

9    Pull, Aim, Squeeze, Sweep.

10         Q.    Did he give you any literature

11    as part of the training?

12         A.    No.

13         Q.    Nothing to read?

14         A.    No.

15         Q.    As you are holding the fire

16    extinguisher, you pull the pin with your

17    left hand or your right hand?

18         A.    Right.

19         Q.    Is the pin on that fire

20    extinguisher on the right side of the

21    trigger or the left side of the trigger?

22         A.    I believe it's on the right

23    side.

24         Q.    Did it look like the fire

A-39

105

```
1    trigger, did it feel cold or any

2    temperature other than the outside air

3    temperature --

4           A.      Not that I recall.

5           Q.      What was the temperature that

6    day, the outside temperature, if you know?

7           A.      It was nice.  The sun was

8    out.  But it was October.  So I would say

9    probably, you know, 50-ish.

10          Q.      And it was November 14 --

11          A.      November.  I'm sorry.  That's

12   right.

13          Q.      So is it fair to say it was

14   pretty brisk?

15          A.      It was a nice day.  I know it

16   was a very nice day.

17          Q.      You picked up the fire

18   extinguisher with which hand?

19          A.      To put the fire out?

20          Q.      Yes, ma'am.

21          A.      I had my -- I pick up with --

22   the trigger with my left hand and then I

23   sweep with -- the hose with my right hand.

24   So both hands, when I actually pick it up,
```

A-40

122

1          A.     Right.

2          Q.     Did he give you any training

3    on inspecting fire extinguishers before

4    use?

5          A.     I don't recall that; no.

6          Q.     Is it fair to say that from

7    the time he lit the fire to the time that

8    you get the extinguisher and put it out,

9    that's about 30 seconds?

10         A.     Yes.

11         Q.     Is it fair to say that during

12   the interim between the time that he lights

13   the fire and the time that you grab it and

14   pull the pin, that you don't have time to

15   inspect the fire extinguisher at that

16   point?

17         A.     No.  I would say I'm under the

18   assumption that these are -- the fire

19   extinguisher is in good working order.

20         Q.     Just so we're clear, you

21   didn't think it was your job or duty to

22   inspect the fire extinguisher --

23         A.     No; absolutely not.

24         Q.     And it's fair to say that you

A-41

123

1   thought or would have assumed that Jerry or

2   one of the instructors --

3          A.    No.

4          Q.    -- inspected it?  Is it fair

5   to say that you assumed that this fire

6   extinguisher was inspected by others before

7   you used it?

8          A.    By others; yes.

9          Q.    After the incident happened

10  and before you walked back to your office,

11  did you have any other discussions with

12  anyone around the scene of the training in

13  that area?

14         A.    The scene of the training?

15         Q.    The area --

16         A.    Or what happened?

17         Q.    Any other discussions with

18  anyone who was in the --

19         A.    Vicinity?

20         Q.    Of the actual training; yes?

21         A.    The only discussion that I had

22  with anyone was regarding my hand after the

23  training.

24         Q.    And have we already talked

A-42

1    instructors did when the folks got to the

2    site was help them through the use of a

3    fire extinguisher.

4              I believe prior to this

5    there was some classroom training on the

6    fire extinguishers.  And one of the

7    things that we had to do when they came

8    to the site for the actual use of the

9    extinguisher was to reemphasize the

10   acronym PASS, P-A-S-S.  This is part of

11   their training.  What that stands for is

12   pull the pin, aim, squeeze and sweep.

13             And what this training does

14   is puts in their minds that acronym so

15   that if they get in a situation where

16   there is a problem and they suddenly

17   forget how to use the extinguisher that

18   goes through their head and they go

19   through the exercise.

20             Before they were using the

21   extinguisher we had asked them each

22   what's the acronym and what's it mean and

23   do it.

24        Q.    Let me back up just a

A-43

Page 26

1   boneyard.  It's a fenced in area -- I'm

2   sorry, it was in Pennsylvania, not

3   Delaware.  It's the other way around.

4           Q.     What was the address for it?

5           A.     The address?

6           Q.     Right.

7           A.     It was 6100 Philadelphia

8   Pike.

9           Q.     Now, is that the same

10  address where the plaintiff, April

11  Baylis, worked?

12          A.     Yes, that's correct.

13          Q.     Did you teach any of these

14  blocks of time?

15          A.     Well, when you say teach

16  that's stretching it, I think.  What we

17  were doing in this boneyard with the fire

18  extinguisher is actually watching these

19  folks use the extinguishers.  Most of

20  them never used one in their lives and

21  this is a good chance for them to get to

22  use one.

23              I believe the classroom

24  training was one issue, the actual usage

A-44

Page 27

```
 1    was with the hands-on.  Our job was to do
 2    the hands-on.  We didn't really do any
 3    instructing, other than going through
 4    that acronym of PASS so that when they
 5    came to the boneyard all they were going
 6    to do is use that extinguisher to put the
 7    flame out.
 8              What we had was a pan of
 9    kerosene which we ignited or we lit.  Our
10    job primarily is to make sure they didn't
11    get too close to it and get burned.
12         Q.    Where was the classroom
13    training being given?
14         A.    It was being given in one of
15    our conference rooms and, again, I'm not
16    sure which one.
17         Q.    How many people were given
18    the classroom training?
19         A.    Every one should have
20    received the classroom training.
21         Q.    Every employee should have
22    received it?
23         A.    Yes.  Yes.
24         Q.    Then did every employee also
```

A-45

1    receive the hands-on training?

2          A.    Yes, that's correct.

3          Q.    Was everyone required to

4    receive the training?

5          A.    Not really, no.

6          Q.    So go back to my other

7    question. Why was it that you said

8    everyone should have received the

9    classroom training?

10          A.    It was a safety day for the

11    company, everybody in the company, and

12    everyone had the opportunity to go to

13    that training. Now, if some didn't -- I

14    don't know if we kept a record of those

15    that did or didn't, I couldn't tell you

16    that. I wasn't there to record that.

17          Q.    Did you give any of the

18    classroom training?

19          A.    No.

20          Q.    What do you call the two

21    people that oversaw the hands-on

22    instructions?

23          A.    What would you call them?

24          Q.    Right.

A-46

Page 29

```
 1          A.     I would just say that they
 2     were supervising the activity, I wouldn't
 3     say they were instructing.
 4          Q.     So they weren't really
 5     instructing, were they -- I'll back up.
 6     Is it fair to call them instructors?
 7          A.     For some folks, yes, because
 8     some folks had never used an extinguisher
 9     before so we had to walk them through it.
10     For others that had used them before it
11     was just a matter of, okay, here's the
12     fire, just be careful, don't get burned.
13          Q.     What do you call the area
14     where the flame was set?  I understand it
15     was sitting in the boneyard.
16          A.     Yes.
17          Q.     What do you call the thing
18     that's being set, the fire?
19          A.     It was a pan.
20          Q.     A pan?
21          A.     Yes.  A pan of kerosene,
22     yes.  It was probably about a four foot
23     by two foot wide, by maybe six inch deep
24     metal pan.
```

A-47

Page 32

1          Q.     The two instructors that

2     were positioned in the boneyard at

3     various times, I think you told me

4     earlier that you were not one of those

5     instructors.

6          A.     I was with Jerry.  I was

7     with Jerry McCarthy, yes.

8          Q.     During what time frame was

9     that?

10         A.     I believe it was at 10:00 to

11    12:00, I think it was.

12         Q.     Okay.  I'm sorry.  Was it

13    during that period that April was

14    injured?

15         A.     Yes, that's correct.

16         Q.     Can you describe for me what

17    you remember of the incident that gives

18    rise to this lawsuit?

19         A.     Okay.  Well, April came out

20    and we had a variety of extinguishers in

21    an area lined up, and I don't recall

22    whether we handed her one or whether she

23    picked one up off the ground, but in any

24    case, she proceeded to the pan that was

A-48

Page 33

1    lit and it was burning and she asked us

2    what do I do and we told her, go through

3    your acronym again and she pulled the

4    pin, she squeezed the handle and she

5    aimed the unit and almost as fast as she

6    aimed the unit you could see the $CO_2$ come

7    out to put the fire out but you could

8    also see it wisping around the area of

9    the handle.

10                    Now, at that time we didn't

11   realize that the unit was leaking.  April

12   shut it off and she said something is

13   coming out on my hand see so we had her

14   put it down.  Now, with $CO_2$, there's an

15   extinguisher there, the whole top of the

16   unit ices up so you can't really tell

17   where it's coming from, but as it cooled

18   down I could see it was coming from, I

19   guess, that tubing on the side there.

20                    Our main concern wasn't

21   really that at the time it was her having

22   a burned hand.  So we told her whether

23   it's cold or hot it's a burn so we

24   instructed her to go back to her office

A-49

Page 64

1          A.    Again, I'm not an

2    extinguisher expert.  I can look at it.

3    It looks the same -- looking at it was

4    when it came in but it was leaking.

5          Q.    I don't mean to suggest that

6    you are an expert in the area of fire

7    extinguishers but from a layman's

8    perspective and from a user's perspective

9    were you able to appreciate any

10   malfunctioning part or any defective part

11   where the $CO_2$ would have leaked from?

12         A.    No.  No, not really.

13         Q.    When you looked at the fire

14   extinguisher after the incident did you

15   make any effort to squeeze the trigger to

16   see if it would --

17         A.    Repeat itself?

18         Q.    -- repeat itself?

19         A.    I didn't, no.  I did not.

20         Q.    Do you know if anyone else

21   did?

22         A.    No, sir, I don't.  I don't

23   know if Jerry did or not.  I didn't.

24         Q.    It was just set aside as far

A-50

IN THE DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

APRIL BAYLIS,                              :
                                          :
      Plaintiff,                          :
                                          :
      v.                                  :    C. A. No. 04-1462-KAJ
                                          :
RED LION GROUP, INC., a corporation       :
of the State of Pennsylvania,             :
                                          :
      Defendant.                          :

**AFFIDAVIT**
STATE OF DELAWARE        :

NEW CASTLE COUNTY        :

     BE IT REMEMBERED that on this 29th day of August, 2005, personally appeared before me the subscriber, a Notary Public in and for the State and County aforesaid, Rus Davis, being by me duly sworn according to law, who did depose and say as follows:

1.     I am over the age of eighteen years.
2.     I am of sound mind and am competent to make this Affidavit.
3.     I am currently employed by Honeywell International Inc. ("Honeywell") and have been so employed for approximately 4 years. I am the health safety environmental specialist at Honeywell and was so on the date of the accident, November 14, 2002. I am familiar with Honeywell's practices and procedures.
4.     In order to prepare this Affidavit, I have also reviewed the documents associated with the incident on Safety Day, November 14, 2002 including the Honeywell incident report, Honeywell incident review, packing slip from Red Lion Group Inc confirming receipt/ shipping of the extinguishers and the letter I sent to Red Lion Group, Mr. Vincent.
5.     Honeywell Chemicals, a business segment within Honeywell, specializes in the manufacture of chemicals, among which include chemicals used in final products such as scents, sticky stuff for post-it notes, etc., pesticides, oils, etc.
6.     I ordered the fire extinguishers for the safety demonstration on November 14, 2002.
7.     Red Lion Group, Inc. was notified that the extinguishers were used for a safety day demonstration and their shipping receipt specifies as such.

A-51

8.  The fire extinguishers in question were kept in a store room which was at normal room temperature. There were no extremes of temperature in the storeroom.

9.  The store room is about 150 yards from the location where the demonstration took place.

10. The statements made in my letter of December 19, 2002 to Elton Vincent of Red Lion Group, Inc. are true to the best of my knowledge and belief.

11. In choosing Red Lion for the extinguishers, I relied on their expertise.

_____
Russell W. Davis

SWORN TO and SUBCRIBED before the day, month and year first written above.

_____
NOTARY PUBLIC
My Commission Expires  2-6-09

A-52

658-9075

Misc 2

**Work Order #**
A21105008

**RLG**
**RED LION GROUP INC.**
Diversified Technologies for Fire, Security and Communications • Since 1920
500 Red Lion Road, Philadelphia, PA 19115-1198
(215) 676-6100 • Fax (215) 464-0154

S.O.S. DEFENDER    JAMES M. CASTLE    MEI SYSTEMS

**CUSTOMER:**

ALLI12

HONEYWELL, INC.
ATTN: RUSS DAVIS
6100 PHILADELPHIA PIKE
CLAYMONT DE 19703

Phone#: 302-791-6724  Month Due:

**DATE:**
2.

HONEYWELL
(FORMERLY ALLIED SIGNAL)
SITE: 6100 PHILADELPHIA PIKE
CLAYMONT DE 19703
Cont: RUSS DAVIS
Caller: RUSS DAVIS
Phone#: 302-791-6748

**SERVICE REQUESTED:**

SUPPLY (15) CO2 EXTINGUISHER FOR IN-HOUSE FIRE DEMO ON
11/14/02
CU

Initials ———> 11/07/02

CREDIT: Net 30 Days  P.O.#

For Hauler

Name

| DESCRIPTION | DONE | P/U | PRICE | DESCRIPTION | DONE | P/U | PRICE | TOTAL |
|---|---|---|---|---|---|---|---|---|
| WEIGH & INSPECT HALON | | | | RECHARGE 5LB ABC | | | | |
| 6 YR MAINT HALON | | | | RECHARGE 10 LB ABC | | | | |
| HYDROTEST HALON | | | | RECHARGE 20 LB ABC | | | | |
| RECHARGE HALON | | | | RECHARGE    LB BC DRY CHEM | | | | |
| | | | | RECHARGE 5LB CO2 | | | | |
| RECHARGE PRES WATER | | | | RECHARGE 10LB CO2 | | | | |
| HYDROTEST PRES WATER | | | | RECHARGE 15LB CO2 | | | | |
| WEIGH & INSPECT WATER | | | | RECHARGE    LB CO2 | | | | |
| WEIGH & INSPECT CO2 TO 20LBS | | | | | | | | |
| WEIGH & INSPECT PRESS DRY CHEM | | | | HYDROTEST CO2 TO 20LBS | | | | |
| WEIGH & INSPECT CART, OPER D/C | | | | HYDROTEST DRY CHEM TO 30 LBS | | | | |
| RECHARGE CART, OPER D/C | | | | 6 YR MAINT DRY CHEM | | | | |
| PARTS FURNISHED | | | | SERVICE CHARGE | | | | |
| | | | | MINIMUM CHARGE | | | | |

HYDROTEST NEEDED: _____

6 YR MAINT NEEDED: _____

CUSTOMERS SIGNATURE: _____

SALES TAX $ _____

TOTAL AMT $ _____

SERVICE TECHNICIAN: _____

p. 1

Aug 29 05 10:24a

A-53

IN THE DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

APRIL BAYLIS,                              :
                                          :
          Plaintiff,                      :
                                          :
     v.                                   :        C. A. No. 04-1462-KAJ
                                          :
RED LION GROUP, INC., a corporation       :
of the State of Pennsylvania,             :
                                          :
          Defendant.                      :

**AFFIDAVIT**

STATE OF DELAWARE        :

NEW CASTLE COUNTY        :

     BE IT REMEMBERED that on this _29th_ day of August, 2005, personally appeared before me the subscriber, a Notary Public in and for the State and County aforesaid, Charles McClain, being by me duly sworn according to law, who did depose and say as follows:

1. I am over the age of eighteen years.
2. I am of sounds mind and am competent to make this Affidavit.
3. I am currently employed by Honeywell International Inc. ("Honeywell") and have been so employed for approximately 14 years. I am a Mechanic 1/C. On November 13, 2002 and November 14, 2002 I was filling in for the Storehouse Operator 1/C. I am familiar with Honeywell's practices and procedures.
4. In order to prepare this Affidavit, I have also reviewed the documents associated with the incident on Safety Day, November 14, 2002 to include Honeywell's incident report as well as the packing slip from Red Lion Group Inc containing my signature confirming receipt of the extinguishers.
5. Honeywell Chemicals, a business segment within Honeywell, specializes in the manufacture of chemicals, among which include chemicals used in final products such as scents, sticky stuff for post-it notes, etc., pesticides, oils, etc.
6. I received the fire extinguishers from Red Lion on November 13, 2002.
7. The fire extinguishers were unloaded from the Red Lion truck and placed in Honeywell's storeroom.
8. None of the fire extinguishers were dropped or damaged by any Honeywell employee, to the best of my knowledge and belief .
9. The fire extinguishers remained locked in the storeroom until the next day.

A-54

10.    The fire extinguishers for use in Safety Day were set aside and not mixed with any other extinguishers that were in the store room.

Charles McClain

SWORN TO and SUBCRIBED before the day, month and year first written above.

NOTARY PUBLIC
My Commission Expires 2-6-09

A-55