NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 06-1010

---

APRIL BAYLIS,

<u>Appellant</u>,

v.

RED LION GROUP, INC., A CORPORATION OF THE STATE OF
PENNSYLVANIA,

<u>Appellee</u>

---

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 04-cv-01462)
District Judge: Honorable Kent A. Jordan

---

Submitted Under Third Circuit LAR 34.1(a)
January 8, 2007

Before: SLOVITER, RENDELL, *Circuit Judges*, and IRENAS,[*] *Senior District Judge.*

(Filed January 24, 2007)

---

[*] Honorable Joseph E. Irenas, Senior United States District Judge for the District of New Jersey, sitting by designation.

OPINION

**IRENAS**, Senior United States District Judge.

Appellant commenced this action claiming that she was injured by an unreasonably dangerous fire extinguisher manufactured and distributed by Appellee.[1] Appellant advanced five claims against Appellee: (1) negligent manufacture; (2) failure to warn; (3) strict liability; (4) warranty of merchantability; and (5) implied warranty of fitness for a particular purpose. On December 7, 2005, the District Court (Jordan, J.) granted Appellee's motion for summary judgment on all claims. Appellant now appeals the granting of summary judgment with respect to claims (1), (3), and (4).

I.

On November 14, 2002, Appellant participated in a "Health and Safety Day" event at Honeywell International, Inc. ("Honeywell"), her place of employment. This program included hands-on fire extinguisher training, using fire extinguishers supplied by Appellee. Appellant had never operated a fire extinguisher before.

Appellee leased 21 extinguishers to Honeywell and delivered them the day before

---

[1] The basis of subject matter jurisdiction in this case is diversity of citizenship. Under the *Erie* Doctrine, we must apply the substantive law of Delaware. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

the demonstration.[2] Honeywell received the extinguishers and moved them from the loading dock to a storeroom located in the same building as the loading dock, where they were stored overnight. The storage room was locked at the end of that day and unlocked the following morning. The temperature in the storage room was average room temperature. Three of the 21 extinguishers had a capacity of five pounds, while the remainder were of a different size.

The following morning, Honeywell transported the extinguishers from the storage room to the "Boneyard" where the demonstrations took place. Honeywell used a three foot by four foot handcart with four inch sides to move the extinguishers, although there is no evidence in the record as what method, if any, was used to fasten the extinguishers in place or any evidence concerning the nature of the terrain over which the handcart moved.

The distance between the storage room and the Boneyard was 150 yards. Appellant received instructions and a lecture prior to her operation of the fire extinguisher. When it was her turn, she pulled the trigger to release $CO_2$ from one of the three five pound extinguishers. However, $CO_2$ leaked from a compression fitting where Appellant was holding the device with her left hand, and not from the nozzle as designed.

---

[2] "Before they were delivered to Honeywell, the extinguishers were recharged, inspected, and deemed to be safe and in good working condition by Red Lion. . . Red Lion transported the extinguishers in an upright position in a van, in which they were secured by ratchet strap belts while in transit." *Baylis v. Red Lion Group, Inc.*, 2005 WL 3309613 (D. Del.), at *1.

Appellant suffered a burn on her left hand. According to a witness, Patrick McCarthy, carbon dioxide leaked from the area where the piping was screwed into the handle.

After Appellant's injury, the extinguishers were returned and Honeywell reported the incident to Appellee. Russell Davis, a Honeywell health safety environmental specialist, flagged the extinguisher he thought that Appellant had used. However, Mr. Davis stated later in a letter that he was unsure that he actually tagged the correct extinguisher. Appellee tested only the tagged extinguisher and found no defect.[3]

Elton Vincent, Appellee's Director of Service and Training, testified in deposition that during the operation of the fire extinguisher, $CO_2$ should not leak out of any place but the end of the nozzle. (Appx. at p. 36). Indeed, he testified that something is wrong if $CO_2$ leaks out anywhere except the nozzle. (Appx. at p. 37).

Appellee moved for summary judgment, which the District Court granted with respect to all claims.[4] As to Appellant's negligent design/manufacturing, strict liability, and implied warranty of merchantability claims, the District Court reasoned that "the plaintiff must establish that the product was defective" in order to prevail. *Joseph v.*

---

[3] On December 19, 2002, thirty-six days after the occurrence, Davis wrote to Vincent that: "When the fire extinguishers were moved to the loading dock the extinguisher in question was mixed with the other two of the same type. While on the loading dock, I place a 'Danger - DO NOT USE," tag on the extinguisher I believed to be involved in the incident. However, I was not sure." (Appx. at p. 38).

[4] Because Appellant is not appealing the District Court's decision on the claims for failure to warn and implied warranty of fitness for a particular purpose, this opinion will not discuss them.

*Jamesway Corp.*, 1997 WL 524126, at *3 (Del. Super. 1997) (negligence theory); *see also Reybold Group, Inc. v. Chemprobe Techs., Inc.*, 721 A.2d 1267, 1269 (Del. 1998) (strict liability theory); *Kates v. Pepsi Cola Bottling Co.*, 262 A.2d 308 (Del. Super. 1970) (merchantability theory). When, as here, Appellant presented no direct evidence of a manufacturing defect based on expert examination of the product, she may make a circumstantial *prima facie* case that the product was defective by showing "(1) a malfunction and (2) evidence eliminating abnormal use or reasonable secondary causes for the malfunction." *Joseph* at *2.[5] The District Court concluded that Appellant failed to satisfy the second prong and granted summary judgment to Appellee.

II.

This Court reviews a District Court's granting of summary judgment *de novo*, and we must grant all reasonable inferences from the evidence of the non-moving party below. *Atkinson v. LaFayette College*, 460 F.3d 447, 451 (3d Cir. 2006); *see also Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 246-47 (3d Cir. 2002).

III.

---

[5] Since negligence involves an element of defendant's fault, merely finding a product defect may be insufficient. Thus, proving negligence, especially with circumstantial evidence, is particularly difficult. "In order to prove the defendant's negligence by circumstantial evidence, however, it is necessary that the conclusion of negligence be the only inference possible from the admitted circumstances." *Ciociola v. Coca-Coca Bottling Co.*, 172 A.2d 252, 257 (Del. 1961).

Appellant appeals the District Court's ruling on its negligence, strict liability,[6] and merchantability claims. The District Court determined that Appellant failed to present sufficient circumstantial evidence that the extinguisher was defective when it was delivered to Honeywell. In granting summary judgment to Appellee, the District Court primarily relied on three cases. *Joseph*, 1997 WL 524126; *Ciociola v. Del. Coca-Cola Bottling Co.*, 172 A.2d 252, 257 (Del. 1961); *DiIenno v. Libby Glass Div.*, 668 F. Supp. 373, 377 (D. Del. 1987).

In *Ciociola*, the plaintiff injured her hand when a Coke bottle broke as she attempted to pry off the cap. 172 A.2d at 255. After describing in great detail both the possible movement of coke bottles within the store and the number of people who had access to the cooler where Coke bottles were stored, 172 A.2d at 254, the court upheld a directed verdict for the defendant on the plaintiff's negligent manufacturing theory, finding the plaintiff failed to eliminate the possibility that the bottle was damaged after it was delivered by the defendant. "The defect in the bottle, if it existed at the time the minor plaintiff applied the bottle opener, could well under the evidence have been caused by jostling or hitting the bottle after it was delivered to the Ciociola store. *Id.* at 259-60.

---

[6] The Delaware Supreme Court held in *Cline v. Prowler Indus. of Md., Inc.*, that the UCC preempted common law strict liability in cases of sales of goods. 418 A.2d 968 (Del. 1980). At the time of this decision, the preemption did not apply to leased products. *Id.* at 980 ("the U.C.C. makes no reference to a bailment-lease."). An argument can be made that Delaware's subsequent adaption of Article 2A of the UCC, which governs commercial transactions involving leasing, preempted common law strict liability in cases of leased goods. However, no Delaware court has definitively ruled on this question, and Appellee did not raise this argument.

*Dilenno* involved a peanut filled glass jar which shattered when plaintiff attempted to replace the cork lid after removing some peanuts. After purchasing the jar, the plaintiff had kept the it on a shelf near her desk where she and her co-employees accessed the jar and removed peanuts several times per day. 668 F. Supp. at 375. The court granted summary judgment for the defendant because the plaintiff "produced no evidence of a manufacturing defect apart from the occurrence of the accident itself. This is wholly insufficient." 668 F. Supp. at 378. The plaintiff in that case failed to eliminate the possibility that the jar, which broke in her hand, was "dropped or mishandled" after it was delivered by the defendant and left openly on her desk for almost a week. *Id*. at 379. Similar reasoning was applied in *Joseph*, 1997 WL 524126, at *5 (granting summary judgment on a negligent manufacturing claim due to insufficient evidence showing that a stationary bicycle was defective when delivered).

It is well-established under Delaware law that a plaintiff in a products liability case must show a defect in the product and that the defect was the proximate cause of the injury. *Reybold Group, Inc. v. Chemprobe Technologies, Inc.*, 721 A.2d 1267, 1269 (Del. 1998). That the accident occurred and someone sustained injury, without more, is insufficient to infer that a manufacturing defect existed at the time of sale. *DiIenno*, 668 F. Supp. at 377.

In this case, Appellant did not eliminate the possibility of damage during the time between the extinguisher's delivery and its alleged malfunction. After Appellee delivered the extinguishers, they were transported to a storeroom, kept there overnight,

7

and again moved by Honeywell employees the next day to the area used for the demonstration.

The loading dock and the storage room were in the same building, but after unloading the extinguishers were moved about 40 feet to the back of the storage room. John Garzia was working in the loading dock/storage room area when the extinguishers were delivered, (Appx. at p. 42) but there is no affidavit or deposition testimony from him.  Appellant produced an affidavit from Charles McClain which provided that the extinguishers were not dropped or damaged "to the best of [the witness'] knowledge and belief," (Appx. at p.24), but nothing in the affidavit suggests that he actually observed the extinguishers during their movement from place to place. Another witness, Patrick McCarthy, testified that he knew the extinguishers were in storage (Appx. at p. 39) but that he did not know who moved them to the demonstration site (Appx. at p. 41), although he believed that they were delivered there in a three foot by four foot handcart with four inch sides. (Appx. at p. 40).

In short, between their delivery by Appellee to Honeywell on November 13 to their use at the fire safety training on November 14, the extinguishers, which are relatively bulky items, appear to have been moved by Honeywell at least five times: (i) after initial receipt from Appellee they were moved 40 feet from the loading dock to the overnight storage location; (ii) the next day they were moved from their storage location to the edge of the loading dock; (iii) then they were moved from the loading dock into the small handcart; (iv) once in the handcart they were moved 150 yards to the place where

the incident occurred; and (v) finally, at the Boneyard the extinguishers were unloaded from the handcart for use in the training program.

Significantly, with respect to the loading of the extinguishers into the handcart and their movement to the demonstration site, there is no evidence as to how or whether the extinguishers were fastened or secured in the small handcart,[7] the nature of the terrain over which they were moved, or the identity of the person or persons who handled this task. Other than a few generalizations, there is really no meaningful evidence as to what happened during any of these five movements, any one of which might have caused damage to an extinguisher. *See*, *e.g.*, *Ciociola; DiIenno*.

IV.

The circumstantial evidence offered by Appellant is insufficient to "negate other reasonable causes of the injury sustained." *Reybold*, 721 A.2d at 1270; *Fatovic*, 2003 WL 21481012, at *3. It therefore does not support an inference that the fire extinguisher used by Appellant was defective at the time it was delivered to Honeywell. For the reasons set forth above, the Order of the District Court granting summary judgment in favor of Appellee will be affirmed.

---

[7] Compare fn.2, *supra*.